# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# BEAUMONT DIVISION

| | |
|---|---|
| JEREMY ROBISON, individually and on behalf of his son, a MINOR, and all similarly situated persons,<br>    *Plaintiffs*,<br><br>V.<br><br>CNA INSURANCE COMPANY,<br><br>    *Defendant*. | §<br>§<br>§ CASE NO. 1:17-CV-508<br>§<br>§ JUDGE MARCIA A. CRONE<br>§<br>§<br>§<br>§<br>§<br>§ |

**PLAINTIFFS' MOTION TO STRIKE DEFENDANT'S EXPERT DAVID B. ROSENFIELD, M.D.**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... 2

TABLE OF AUTHORITIES .................................................................................................... 3

ARGUMENT ............................................................................................................................... 6

   I.    INTRODUCTION ............................................................................................................ 6

   II.   ARGUMENT AND AUTHORITIES ............................................................................. 8

          (a)  Dr. Rosenfield's opinions are not the product of reliable principles or methods ......................................................... 12

          (b)  Dr. Rosenfield's. "findings" are not on sufficient facts or data ............................................................................................ 13

          (c)  Dr. Rosenfield has not reliably applied the principles and methods to the incontrovertible facts of this case .............. 14

   III.  CONCLUSION ............................................................................................................. 17

   IV.  PRAYER ....................................................................................................................... 17

CERTIFICATE OF SERVICE ............................................................................................... 19

CERTIFICATE OF CONFERENCE ..................................................................................... 20

REQUEST FOR ORAL HEARING ....................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Albert v. City of Petal*
    819 F. App'x 200 (5th Cir. 2020) ............................................................................................8

*Arkoma Basin Exploration Co. v. FMF Assocs. 1990–A, Ltd.*
    249 S.W.3d 380 (Tex. 2008) ................................................................................................10

*Bella v. Cain*
    No. CIV.A. 12-2323, 2015 WL 1311216, (E.D. La. Mar. 23, 2015) ..................................9

*Bustamante v. Ponte*
    529 S.W.3d 447 (Tex. 2017) ................................................................................................10

*Daubert v. Merrell Dow Pharms., Inc.*
    509 U.S. 579 (1993) ..................................................................................................... 8–11, 17

*Dearmond v. Wal–Mart La. LLC*
    335 F. App'x 442 (5th Cir. 2009) ..........................................................................................9

*Grant v. CRST Expedited*
    No. 1:18-CV-433, 2020 U.S. Dist. LEXIS 255058 (E.D. Tex. 2020) ............................8-9

*Guy v. Crown Equip. Corp.*
    394 F.3d 320 (5th Cir. 2004) ..................................................................................................8

*Hathaway v. Bazany*
    507 F.3d 312 (5th Cir. 2007) ..................................................................................................9

*Hicks-Fields v. Harris Cnty.*
    860 F.3d 803 (5th Cir.), cert. denied, 138 S. Ct. 510 (2017) ..............................................8

*Huss v. Gayden*
    571 F.3d 442 (5th Cir. 2009), cert. denied, 559 U.S. 1006 (2010) ....................................8

*Knox v. Ferrer*
    No. 5:07-CV-6, 2008 WL 4411326 (S.D. Miss. Sept. 22, 2008) ........................................9

*Kumho Tire Co. v. Carmichael*
    526 U.S. 137 (1999) ......................................................................................................... 8–9, 12

*Mathis v. Exxon Corp.*
    302 F.3d 448 (5th Cir. 2002) ..................................................................................................9

*Munn v. City of Ocean Springs*
    No. 1:14CV428-LG-RHW, 2016 WL 9779797 (S.D. Miss. Apr. 13, 2016)........................9

*Nano–Proprietary, Inc. v. Cannon, Inc.*
    537 F.3d 394 (5th Cir. 2008).........................................................................................8

*Pipitone v. Biomatrix, Inc.*
    288 F.3d 239 (5th Cir. 2002).................................................................................... 9, 11

*Primrose Operating Co. v. Nat'l Am. Ins. Co.*
    382 F.3d 546 (5th Cir. 2004).....................................................................................9-10

*Roman v. W. Mfg., Inc.*
    691 F.3d 686 (5th Cir. 2012).........................................................................................9

*Sandifer v. Hoyt Archery, Inc.*
    907 F.3d 802 (5th Cir. 2018).................................................................................. 11-12

United States v. 14.38 Acres of Land
    80 F.3d 1074 (5th Cir. 1996).........................................................................................9

United States v. Bourgeois
    950 F.2d 980 (5th Cir. 1992).........................................................................................8

United States v. Cooks
    589 F.3d 173 (5th Cir. 2009), cert. denied, 559 U.S. 1024 (2010).......................................8

United States v. Ebron
    683 F.3d 105 (5th Cir. 2012).........................................................................................9

United States v. Hicks
    389 F.3d 514 (5th Cir. 2004).....................................................................................8-9

United States v. Schaffer
    439 F. App'x 344 (5th Cir. 2011) ..................................................................................8

United States v. Valencia
    600 F.3d 389 (5th Cir.), cert. denied, 562 U.S. 893 (2010).......................................... 8, 10

*Viterbo v. Dow Chem. Co.*
    826 F.2d 420 (5th Cir. 1987).........................................................................................9

*Watkins v. Telsmith, Inc.*
    121 F.3d 984 (5th Cir. 1997).......................................................................................10

*Wellogix, Inc. v. Accenture, L.L.P.*
    716 F.3d 867 (5th Cir. 2013), cert. denied, 573 U.S. 904 (2014)..........................................8

*Wells v. SmithKline Beecham Corp.*
    601 F.3d 375 (5th Cir. 2010).................................................................................................9

*White v. Deere & Co.*
    Civil Action No. 13-cv-02173-PAB-NYW, 2016 U.S. Dist. LEXIS 15644 (D. Colo. 2016) .. 12

*Wilson v. Woods*
    163 F.3d 935 (5th Cir. 1999)................................................................................................8

## Statutes

FED. R. EVID. 702............................................................................................................ 8, 10–11

TO THE HONORABLE JUDGE MARCIA A. CRONE:

COME NOW, Jeremy Robison, individually and on behalf of his son, a MINOR, and all other similarly situated persons, and all Plaintiffs in both their individual and representative capacities as named in *Plaintiffs' Third Amended Complaint* (Doc. 53),[1] and file this *Plaintiffs' Motion to Strike Defendant's Expert David B. Rosenfield, M.D.* (hereinafter, "Motion") complaining about Defendant, CNA Insurance Company, and in support hereof, would show as follows:

## I. INTRODUCTION

This is a putative class action in which Plaintiffs allege permanent brain injuries arising from carbon-monoxide poisoning at Marshall Middle School. On or about January 28, 2016, an improperly inspected boiler leaked dangerous amounts of carbon monoxide ("CO") throughout Marshall Middle School through ductwork from the boiler room throughout the school. As a result, many Beaumont students, along with Beaumont Independent School District employees, were poisoned—indeed, some rendered unconscious, requiring medical treatment. One hundred and seventy-five (175) people—all of them Texas citizens (and local residents)—were treated on site by emergency medical services and first responders for carbon monoxide exposure and poisoning. Sixty-nine (69) of those people treated on site were transported in emergency vehicles to local medical facilities. Plaintiffs further allege that another one hundred five (105) individuals went to local medical facilities as walk-in patients.

In spite of the incontrovertible—albeit upsetting—fact that Plaintiffs were exposed to remarkably elevated levels of CO within the classrooms and halls of Marshall Middle School and

---

[1] Due to the number of Plaintiffs and for the sake of efficiency, they will not all be named herein; but the identities and capacities in which they sue are incorporated herein by reference.

poisoned,[2] Dr. David B. Rosenfield, the Defendant's retained neurologist (hereinafter, "Dr. Rosenfield") steadfastly, sternly, and unapologetically proclaims that he "do[es] not believe that exposure to carbon monoxide on January 28, 2016 caused any clinically significant enduring clinical compromise" for any and all of the thirty-nine (39) injured parties, represented herein.

Dr. Rosenfield's nigh indefensible propositions, each and all suffering less from McNamara's fallacy[3] but more so repeated illicit affirmatives,[4] are nothing more than *ipse dixit*. Dr. Rosenfield fails to apply the generally accepted methodology of differential diagnosis in the medical community and disregards the integrative nature of medicine by summarily, and without explanation, dismissing the known facts of Plaintiffs' exposure and poisoning – *i.e.*, the lab testing confirming the elevated presence of blood carboxyhemoglobin, etc. As such, his testimony should be excluded in whole or in part.

---

[2] In fact, multiple students' blood carboxyhemoglobin (COHb) levels, as measured by emergency physicians and medical personnel motivated solely by the Hippocratic Oath and the natural human desire to care for others in distress, were in excess of 10% **when tested**. For reference, the National Center for Biotechnology Information, a part of the United States National Library of Medicine (itself a branch of the National Institutes of Health), reports that the typical COHb level in a nonsmoker is .05-1.5%. The same report informs that COHb levels of 5-20% correspond to the following adverse health effects: "[n]eurobehavioral/cognitive changes, including visual and auditory sensory effects (decreased visual tracking, visual and auditory vigilance, visual perception), fine and sensorimotor performance, cognitive effects (altered time discrimination, learning, attention level, driving performance), and brain electrical activity." Wilbur S, Williams M, Williams R, *et al.*, *Toxicological Profile for Carbon Monoxide*, Table 2-1, [Blood Carboxyhemoglobin (COHb) Levels Corresponding to Adverse Health Effects of Carbon Monoxide], Atlanta (GA): Agency for Toxic Substances and Disease Registry (US) (Jun. 2012), https://www.ncbi.nlm.nih.gov/books/NBK153692/table/T10/

[3] Named for United States Secretary of Defense Robert McNamara, the fallacy is the result of making a decision based solely on quantitative observations and ignoring all others (*i.e.*, qualitative measures). Here, Dr. Rosenfield altogether ignores not only the quantitative observations of COHb but also patient history, brain imagining, and even his own findings (*i.e.*, his complete disregard of graphesthesia in some plaintiffs).

[4] The illicit affirmative is a syllogistic fallacy, wherein the result is a negative conclusion from an affirmative premise. Specifically, it occurs where two premises are affirmative (positive) and the conclusion is negative. For example:
  (a) **All Plaintiffs were poisoned by CO.** (Plaintiffs' affirmative statement that serves as the basis for their cause of action).
  (b) **Some CO adverse health effects are found in Plaintiffs.** (Plaintiffs have each testified to this in their respective depositions).
  (c) **Therefore, some CO adverse health effects aren't the result of CO.** (The entirety of Dr. Rosenfield's conclusions. Save of course for the fact that Dr. Rosenfield concludes that **all** reported and observed CO adverse health effects are determined by him not to be the result of CO.)

## II.   ARGUMENT AND AUTHORITIES[5]

The admission or exclusion of expert witness testimony is a matter that is left to the discretion of the district court.[6] Indeed, the Court's discretion is guided pursuant to RULE 702 of the FEDERAL RULES OF EVIDENCE:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) **the testimony is based on sufficient facts or data**; (c) **the testimony is the product of reliable principles and methods**; and (d) **the expert has reliably applied the principles and methods to the facts of the case**.[7]

Prior to admitting expert testimony, "[d]istrict courts must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'"[8] Accordingly, "[t]o qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.'"[9]

The trial court possesses considerable flexibility in assessing the reliability of expert testimony.[10] Given the diverse contexts in which expert testimony is offered, the application of specific factors may not be appropriate in any individual case.[11] Indeed, "*Daubert's* list of specific

---

[5] In accord with *stare decisis*, Plaintiffs rely primarily upon *Grant v. CRST Expedited*, No. 1:18-CV-433, 2020 U.S. Dist. LEXIS 255058 (E.D. Tex. 2020), which was this Court's December 16, 2020 *Memorandum and Order* [Doc. 216] in aforecited case.

[6] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 810 n.22 (5th Cir.), cert. denied, 138 S. Ct. 510 (2017); *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009), cert. denied, 559 U.S. 1006 (2010); *Nano-Proprietary, Inc. v. Cannon, Inc.*, 537 F.3d 394, 399 (5th Cir. 2008).

[7] FED. R. EVID. 702 (emphasis added); *accord Kumho Tire Co.*, 526 U.S. at 152; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993).

[8] *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999); *accord* FED. R. EVID. 702; *Albert v. City of Petal*, 819 F. App'x 200, 202 (5th Cir. 2020); *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013), cert. denied, 573 U.S. 904 (2014).

[9] *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)), cert. denied, 546 U.S. 1089 (2006); *accord United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009), cert. denied, 559 U.S. 1024 (2010).

[10] *Kumho Tire Co.*, 526 U.S. at 141; *United States v. Schaffer*, 439 F. App'x 344, 346 (5th Cir. 2011) (citing *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)); *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir.), cert. denied, 562 U.S. 893 (2010).

[11] *Schaffer*, 439 F. App'x at 346 (citing *Kumho Tire Co.*, 526 U.S. at 147-49).

factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination."[12] **The overarching goal "is to make certain that an expert**, whether basing testimony upon professional studies or personal experience, **employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field**."[13]

The court plays the role of a gatekeeper, determining the admissibility of "all types of expert testimony, not just scientific testimony."[14] In this role, "trial courts make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'"[15] The district court should approach this task "with proper deference to the jury's role as the arbiter of disputes between conflicting opinions."[16]

The trial court's role as a gatekeeper "is not intended to serve as a replacement for the adversary system: '[v]igorous cross–examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"[17] "The *Daubert* analysis should not supplant trial on the merits."[18] Rather, "[t]he focus . . . must be solely on principles and methodology [of the expert witness], not on the

---

[12] *Kumho Tire Co.*, 526 U.S. at 141-42; *accord Hicks*, 389 F.3d at 525.
[13] *Kumho Tire Co.*, 526 U.S. at 152 (emphasis added); *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 693 (5th Cir. 2012); *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010).
[14] *United States v. Ebron*, 683 F.3d 105, 139 (5th Cir. 2012) (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)), cert. denied, 571 U.S. 989 (2013); *accord Munn v. City of Ocean Springs*, No. 1:14CV428-LG-RHW, 2016 WL 9779797, at *4 (S.D. Miss. Apr. 13, 2016); *Bella v. Cain*, No. CIV.A. 12-2323, 2015 WL 1311216, at *5 (E.D. La. Mar. 23, 2015); *see Knox v. Ferrer*, No. 5:07-CV-6, 2008 WL 4411326, at *2 (S.D. Miss. Sept. 22, 2008) ("The Court's role is that of a gatekeeper only, limited to determining admissibility, not credibility, of the evidence.") (citing *Pipitone*, 288 F.3d at 244).
[15] *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 592-94).
[16] *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).
[17] *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (quoting *14.38 Acres of Land*, 80 F.3d at 1078); *accord Dearmond v. Wal-Mart La. LLC*, 335 F. App'x 442, 444 (5th Cir. 2009) ("Cross-examination at trial . . . is the proper forum for discrediting testimony, and credibility determinations are, of course, the province of [the fact finder].").
[18] *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002) (citing *Pipitone*, 288 F.3d at 250).

conclusions that they generate."[19] Indeed, "it is the role of the adversarial system, not the court, to highlight weak evidence."[20]

Of course, "[a]n expert's testimony is conclusory if the witness simply states a conclusion without an explanation or factual substantiation."[21] An expert's opinion is an inadmissible conclusory statement where there is no supporting basis for the opinions offered, or the basis offered provides no real support.[22] Where "the expert merely gives an unexplained conclusion or asks the jury to 'take my word for it' because of his or her status as an expert" the opinion is conclusory and cannot be considered.[23]

When the necessity to strike an expert arises, the undersigned is ever careful to pick his battles wisely. Hence, Plaintiffs do not challenge Dr. Rosenfield's "scientific, technical, or other specialized knowledge."[24] But where, as here, an opinion is so lacking in reliability, it becomes necessary to challenge that opinion and put before this Court that expert's failures.

To that end, Plaintiffs must note the Dr. Rosenfield near ubiquitous red herring[25]:

> One should note that the brain does not have pain receptors (*e.g.*, Alzheimer's disease and Parkinson's disease do not hurt [physically]). The only pain receptors within the cranial vault are within the meninges (**no one contends that R.R. has meningitis**) and the walls of arteries, that can be disrupted from tumor or hemorrhage or swell from migraine, none of which pertain to [R.R.].

---

[19] *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997) (quoting *Daubert*, 509 U.S. at 594-95); see *Valencia*, 600 F.3d at 419.
[20] *Primrose Operating Co.*, 382 F.3d at 563.
[21] *Bustamante v. Ponte*, 529 S.W.3d 447, 462 (Tex. 2017) (internal citations omitted).
[22] *Id.*
[23] *Arkoma Basin Exploration Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 389 (Tex. 2008).
[24] FED. R. EVID. 702(a).
[25] In no less than thirty (30) reports, Dr. Rosenfield repeats *ad nauseaum* the same and/or similar boilerplate language. See Dr. Rosenfield's Sept. 14, 2020 reports attached hereto as Exhibit A re: J.A (A-1), H.B. (A-2), A.B (A-3), J.B. (A-4), J.C. (A-5), J.C. (A-6), J.C. (A-7), M.D (A-8), J.D. (A-9), R.D. (A-10), C.H. (A-11), B.J. (A-12), C.K (A-13), J.L. (A-14), J.M (A-15), D.M. (A-16), T.O. (A-17), C.P. (A-18), P.P. (A-19), R.R. (A-20), S.R. (A-21), P.R. (A-22), R.R. (A-23), A.S. (A-24), H.S. (A-25), L.V. (A-26), M.V. (A-27), I.W. (A-28), Lynda Willie (A-29), and A.W. (A-30).

> If [R.R.]'s complaints of headache are valid, they are independent of cerebral compromise, could reflect cervical muscle-tension headache but are independent of transient exposure to a gas (carbon monoxide) that occurred over four years previously and have not been associated with any objective cervical compromise (*e.g.*, no focal motor deficits, no reflect asymmetry) and could relate to the stresses and rigors of going through adolescence.
>
> Regardless, [R.R.'s] headaches are classical for muscle tension headaches, responds to symptomatic treatment and are independent of any brain-related problem or exposure to carbon monoxide.[26]

But these aloof musings about "muscle tension headaches" for children inhaling life-altering amounts of CO are is, as Dr. Julio Andino aptly notes himself, disingenuous.[27] How so?

Dr. Rosenfield improperly attempts to dismiss complaints of headaches on the basis that there are no pain receptors in the brain. Well what, pray tell, does that have to do with price of tea in China? Nothing.[28] But fear not for such is relevant for other reasons.[29] And whilst he should know better—recall that Plaintiffs do not challenge his "scientific, technical, or other specialized knowledge"[30]—Dr. Rosenfield's glossy, conclusory musings are not the product of reliable principles or methods, not based on sufficient facts or data, and he has not reliably applied the principles and methods to the facts of this case.

---

[26] *See* Exhibit A-23, Dr. Rosenfield's Sept. 14, 2020 report re: R.R (emphasis added). Please note that Mr. R.R.'s **post-exposure**, **off-site**, blood carboxyhemoglobin (COHb) levels, as measured by emergency physicians and medical personnel **pre-lawsuit**, was 10.6H.; *See* also Exhibit B, January 28, 2016 Christus St. Elizabeth Medical Record pertaining to Plaintiff R.R.

[27] *See* Exhibit C, Deposition of Dr. Julio Andino 122:1-25.

[28] Recall, that "[u]nder *Daubert*, expert testimony is 'admissible only if it is both relevant and reliable.'" *Sandifer v. Hoyt Archery, Inc.*, 907 F.3d 802, 807-08 (5th Cir. 2018) (citing *Pipitone*, 288 F.3d at 244 (5th Cir. 2002)). Dr. Rosenfield's admittedly irrelevant mentioning of the meninges is the exact sort of thing that motions to strike are meant to cure. **"No one contends that [Plaintiff] has meningitis"** *See* Exhibit A (1-30) at pages 7, 14, 21, 28, 37, 45, 54, 62, 71, 79, 87, 95, 104, 111, 121, 129, 139, 147, 153, 161, 168, 174, 185, 192, 198, 206, 212, 222, 231, and 241.

[29] Dr. Rosenfield might well be compared to the central character of the 7th and 6th century B.C. fable "The Boy Who Cried Wolf." 210 The Boy Who Cried Wolf, *Aesopica*. Here, he may be known as the *Dr. Who Cried Meninges* and when and wheresoever Dr. Rosenfield palliates—cries—then the townsfolk must be ever cautious for his intellectual dishonesty hath ruined whatever truth he might have had to offer. Palliate: to reduce the violence of (a disease) or to ease (symptoms) without curing the underlying disease; **to cover by excuses and apologies**; and/or to moderate the intensity of [a thing]. *Palliate*, Merriam-Webster (emphasis added).

[30] FED. R. EVID. 702(a).

### (a) DR. ROSENFIELD'S OPINIONS ARE NOT THE PRODUCT OF RELIABLE PRINCIPLES OR METHODS

While Courts may consider several nondispositive factors when assessing reliability, "[u]ltimately, the test requires that the expert 'employ in the courtroom the same level of intellectual rigor[31] that characterizes the practice of an expert in the relevant field.'[32] Here, Dr. Rosenfield's opinions are neither intellectually honest nor **rigorous**. They are meandering musings in search of some sort of non-descript conclusion.

Dr. Rosenfield's boilerplate language concludes, among other things, that

> Some reports reference the delayed onset of neurological symptoms following exposure to carbon monoxide, which is accurate, but this usually occurs several weeks or a few months following an exposure that produced coma or severe obtundation and is associated with Parkinson-type motor findings on examination, none of which pertain to [**any one of the Plaintiffs**] *e.g.*, no bradykinesia, tremor, rigidity, abnormal extraocular movements).[33]

As a preliminary matter, a fact that undermines Dr. Rosenfield's conclusions, and a fact which he conveniently ignores, R.R. actually did experience "coma."[34] Not only has R.R. testified to that fact, other Plaintiffs have similarly reported that they observed R.R. *in coma.*[35] Yet, facts be darned, Dr. Rosenfield concludes that Mr. Robison was "never in coma" and, all things considered, that he too is "perfectly normal".[36] No matter. The point to be made is much simpler.

The severity of CO poisoning is not correlated with outcome – "[t]he signs and symptoms of poisoning are highly variable, depending on the acuity and duration of the exposure."[37] Indeed, "[a] patient's initial presentation does not predict later outcomes with certainty, but particular

---

[31] Rigor: the fact of being careful and paying great attention to detail. *Rigor*, Oxford English Dictionary.
[32] *White v. Deere & Co.*, Civil Action No. 13-cv-02173-PAB-NYW, 2016 U.S. Dist. LEXIS 15644 *4 (D. Colo. 2016) (citing *Kumho Tire Co.*, 526 U.S. at 152); *see also Sandifer*, 907 F.3d at 807-08.
[33] *See* Exhibit A (1-30) at pages 7, 13, 22, 28, 38, 46, 54, 63, 72, 79, 86, 94, 103, 111, 120, 128, 138, 147, 161, 168, 174, 184, 192, 197, 205, 212, 221, 230, and 241. (emphasis added).
[34] *See* Exhibit B, January 28, 2016 Christus St. Elizabeth Medical Record pertaining to Plaintiff R.R.
[35] *Id.*
[36] *See* Dr. Rosenfield's Sept. 14, 2020 Report re: R.R. (A-23), p. 9.
[37] Lindell K. Weaver, *Carbon Monoxide Poisoning*, New England Journal of Medicine, Vol. 360, No. 12, 1218 (Mar. 2009).

variables known at the time of poisoning are predictive of risks for subsequent sequelae."[38] All of this to say, Dr. Rosenfield's purposeful ignorance of cold, hard, albeit uncomfortable and disturbing, fact is the direct result of the lack of integration of actual facts with neurology, which can best be explained below.

### (b) DR. ROSENFIELD'S "FINDINGS" ARE NOT BASED ON SUFFICIENT FACTS OR DATA

> A.    Again, as I stated in the prior subject, you know, the lack of integration and overall the lack again as I said before of integrating actual neurology into it, assessment of a patient.
>
> [. . .]
>
> [H]e uses facts again that are real anatomical facts and makes jumps and conclusions on clinical aspects of the cases. [. . .]
>
> Q.    What do you mean lack of integration of actual neurology?
>
> A.    Well, again, I'll go back to the most prominent factor is, yes, he states that pain -- there is no pain receptors in the brain and that that dismisses the headaches. He also makes the fact that, you know, because the patients have headaches and only the meninges have pain receptors that the patient does not have meningitis.
>
> Q.    Okay. So, it's the same issue you had before?
>
> A.    Yeah. The whole tenor of his assessments is pretty much the same across the board.[39]

It is not enough to say that Dr. Rosenfield's findings are not based on sufficient facts or data, for in the universe of this matter there is ample—that is sufficient—facts and data (quantifiable, even) to conclude that Plaintiffs have suffered adverse health effects arising from their CO exposure and poisoning. Not only does Dr. Rosenfield refuses to account for the blood carboxyhemoglobin (COHb) levels found in the Plaintiffs[40], he turns a blind eye to his own examinations' findings (*i.e.*,

---

[38] *Id.* at 1220 (citing Weaver LK, Hopkins RO, Chan KJ, *et al.*, *Hyperbaric Oxygen for Acute Carbon Monoxide Poisoning.* New England Journal of Medicine, Vol. 347, 1057-67 (2002) and Weaver LK, Valentine KJ, Hopkins RO, *Carbon Monoxide Poisoning: Risk Factors for Cognitive Sequelae and the Role of Hyperbaric Oxygen*, Am J Respir Crit Care Med, Vol. 176, 491-7 (2007).

[39] *See* Exhibit C, Deposition of Dr. Julio Andino, 154:1-25.

[40] It too should be noted that Defendant's counsel recognizes that "**levels of carbon monoxide, carboxyhemoglobin noted in the emergency department records for those for whom levels were assessed**, though all **had blood drawn one or more hours post-poisoning and generally following provisions of oxygen**, **which prevented peak levels from being identified in any of the exposed individuals were elevated beyond normal limits in numerous individuals** with no alternative explanation such as smoking." *See* Exhibit C, Deposition of Dr. Julio Andino, 101:2-10 (emphasis added).

graphesthesia) and relies upon admittedly irrelevant—albeit uncontroverted—medical facts (that apart from the meninges the brain does not have pain receptors[41]) so as to keep his shaking head buried in the sand. Rather, for want of beating a dead horse, Dr. Rosenfield rejects gestalt for the illicit affirmative – that all CO adverse health effects aren't the result of CO because some other medical fact that is wholly unrelated to the observed symptoms is the cause of an inter-plaintiff reported adverse health effect.

> He is using a fact in which the brain does not have pain receptors and he's using that as [. . .] a statement to state that the patient's headaches are not -- or he's presuming that they're not real.[42]

### (c) DR. ROSENFIELD HAS NOT RELIABLY APPLIED THE PRINCIPLES AND METHODS TO THE INCONTROVERTIBLE FACTS OF THIS CASE

Recall earlier, Dr. Rosenfield's Red Herring—that are no pain receptors in the brain. The memory being refreshed, note that the primary—that is near universal complaint across the Plaintiffs (most of whom are children)—are headaches. And such complaints, contrary to the palliative representations of Dr. Rosenfield, are rife throughout the peer-reviewed literature:

> The symptoms of carbon monoxide poisoning are nonspecific. **Mild exposures result in headache**, myalgia, dizziness, or neuropsychological impairment.[43]
>
> Although **headache is the most common symptom**, there is no characteristic headache pattern typical of CO poisoning.[44]
>
> **The most common symptoms of CO poisoning are headache**, dizziness, weakness, upset stomach, vomiting, chest pain, and confusion.[45]

---

[41] *See* Exhibit C, Deposition of Dr. Julio Andino, 121:8-13.
[42] *See* Exhibit C, Deposition of Dr. Julio Andino, 120:1-25.
[43] Lindell K. Weaver, *Carbon Monoxide Poisoning*, New England Journal of Medicine, Vol. 360, No. 12, 1216 (Mar. 2009) (citing Armin Ernst and Joseph D. Zibrak, *Carbon Monoxide Poisoning*, New England Journal of Medicine Vol. 339, 1603-8 (1998) and Amitai Y, Zlotogorski Z, Golan-Katzav V, Wexler A, Gross D, *Neuropsychological Impairment from Acute Low-level Exposure to Carbon Monoxide*, Archives of Neurology Vol. 55, No. 6, 845-8 (1998)) (emphasis added).
[44] Neil B. Hampson Claude A. Piantadosi, Stephen R. Thom, and Lindell K. Weaver, *Practice Recommendations in the Diagnosis, Management, and Prevention of Carbon Monoxide Poisoning*, American Journal of Respiratory and Critical Care Medicine, Vol. 186, I. 11, p. 1096 (2012) (citing Neil B. Hampson and Lindsay A. Hampson, *Characteristics of the Headache Associated with Acute Carbon Monoxide Poisoning,* Headache: The Journal of Head and Face Pain, 220-223 (Mar. 2002)) (emphasis added).
[45] CDC, *Carbon Monoxide Poisoning*, https://www.cdc.gov/co/faqs.htm (emphasis added).

So, where Dr. Rosenfield's (largely) copy and paste facially skeptical answer to these complaints is either:

> If [Plaintiff's] complaints of headache are valid, they are independent of cerebral compromise, could reflect cervical muscle-tension headache but are independent of transient exposure to a gas (carbon monoxide) that occurred more than four years previously and have not been associated with any objective cervical compromise (*e.g.*, no focal motor deficits, no reflex asymmetry) and could relate to the stress and rigors of going through adolescence.
>
> Regardless, [Plaintiff's] headaches are classical for muscle tension headaches, respond to over-the-counter medications and are independent of any brain-related problem or exposure to carbon monoxide.[46]

Or, better yet,

> [Plaintiff's] headaches are classical for muscle tension headaches. If [Plaintiff's] complaints of intermittent headaches are valid, they could relate to cervical compromise but this too, is not likely given her multiple objectively normal neurological examinations. Regardless the headaches do not relate to exposure to carbon monoxide on January 28, 2016.[47]

εὕρηκα.[48] Whilst both of the aforequoted conclusions are questionable at best, it is when they are read together that Dr. Rosenfield's repeated failures to properly apply principles and methods espoused to the facts of this case are truly underscored.

As to the first quote, Ms. J.L. and Mr. J.A., among others, are reported by Dr. Rosenfield as having a

> perfectly normal motor examination without any [adverse health effects]. Neither I [sic] other health examiners who evaluated noted any of these [adverse health effects]—his [sic] motor system is normal, including assessment of tone, lack of cogwheeling, no bradykinesia or other abnormalities.[49]

---

[46] *See* Exhibit A-1 and A-14, Dr. Rosenfield's Sept. 14, 2020 Reports re: J.A. and J.L.
[47] *See* Exhibit A-6, Dr. Rosenfield's Sept. 14, 2020 Report re: J.C.
[48] Eureka! That was the exclamation of Archimedes of Syracuse, which he shouted naked on the streets of Syracuse. In answer to a problem posed by Heiro II of Syracuse, Archimedes discovered—that is understood—that the volume of water displaced must be equal to the volume of the part of his body (or any object, really) he had submerged.
[49] *See* Exhibit A-14, Dr. Rosenfield's Sept. 14, 2020 Report re: J.L.

15

But Dr. Rosenfield's notes based upon his own physical examinations as to both minor children J.L. and J.A – graphesthesia[50].[51] How can it be that Mr. J.A.—whose post-exposure, off-site, blood carboxyhemoglobin (COHb) level, as measured by emergency physicians and medical personnel **pre-lawsuit**, was 10.4H[52]—had a perfectly normal motor examination with no clinically significant enduring clinical compromise has "some difficulty with graphesthesia on his right forearm and hand[?]"[53] If Drs. Hammel and Weaver "defy credulity"[54], then Dr. Rosenfield is an ostrich, shaking head buried deep, deep in the sand at McFaddin Beach,[55] for Dr. Rosenfield also refuses to accord any weight to Ms. J.L. In fact, Ms. J.L.'s post-exposure, off-site, blood carboxyhemoglobin (COHb) level, as measured by emergency physicians and medical personnel pre-lawsuit, was 6H[56] and she too is reported to be perfectly normal.[57] But how can Ms. J.L. be perfectly normal when her two-point discrimination is decreased in all four limbs and her graphesthesia is slightly decreased in her right arm and left leg?[58]

The neurological independent medical examination protocol ("IME") calls for imaging of all exposed plaintiffs as part of Dr. Rosenfield's neurological evaluation. Dr. Rosenfield, without any explanation, dropped the MRI from the protocol then and then failed to explain how the MRI imagine obtained on some plaintiffs is not relevant. It is apparent Dr. Rosenfield agreed with Plaintiffs' experts and believed a proper IME required MRI imaging. Rejecting and ignoring facts,

---

[50] Graphesthesia is the ability to recognize writing (*e.g.*, letters and/or numbers) on the skin purely by the sensation of touch. It is a cornerstone of sensory neurological examinations.
[51] *See* Exhibit A-1 and A-14, Dr. Rosenfield's Sept. 14, 2020 Reports re: J.A. and J.L.
[52] *See* fn. 2 of this *Motion* and the table cited therein; *see also* Exhibit D, January 28, 2016 Medical Center of Southeast Texas Medical Record pertaining to Plaintiff J.A.
[53] *See* Exhibit A-1 and A-14, Dr. Rosenfield's Sept. 14, 2020 Reports re: J.A. and J.L.
[54] *See* Exhibit A-1, Dr. Rosenfield's Sept. 14, 2020 Report re: J.A. at p.8.
[55] McFaddin Beach is a twenty (20) mile, hard packed beach extending from Sea Rim State Park in Jefferson County, Texas to High Island, Galveston County, Texas.
[56] *See* fn. 2 of this *Motion* and the table cited therein; *see also* Exhibit E, January 28, 2016 Medical Center of Southeast Texas Medical Record pertaining to Plaintiff J.L.
[57] *See* Exhibit A-14, Dr. Rosenfield's Sept. 14, 2020 Report re: J.L.
[58] *Id.*

16

coupled with a refusal to ask the right questions, may yield an answer Dr. Rosenfield and Defendant like – it's just an answer that fails even the simplest of analyses, let alone any rigorous one. One can never see the light if he leaves his shaking head buried in the sand.

Fatally, Dr. Rosenfield has failed to explain how, despite the evidence of excessive carbon monoxide exposure, objective brain imaging that reveals damage from lack of oxygen to many of these plaintiffs and the wealth of medical literature that relates the same to causing chronic headache, he can rule out the exposure as a cause of these headaches in favor of tension headaches. The only means by which these Plaintiffs can be deemed perfectly normal is if Dr. Rosenfield ignores the reality that responses to carbon monoxide exposures are variable and CO at such levels is known to be harmful.

### III. CONCLUSION

Where reliability requires rigor and *Daubert* requires reliability and relevance, Dr. Rosenfield's opinions are neither rigorous nor relevant. They are, instead, built upon an incomplete amalgamation of cherry-picked and ignored facts, devoid of any sound basis in the peer-reviewed literature. If this Court should deny Plaintiffs' *Motion*, Plaintiffs pray that the Court will, at minimum, prevent Dr. Rosenfield from relying upon and/or referencing the lack of pain receptors in the brain to explain away what is an incontrovertible fact – that the Plaintiffs, in addition to an unfortunate wealth of other neurological injuries, suffer headaches.

### IV. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that this *Motion* be granted, that the relief sought be granted (Dr. Rosenfield's testimony be stricken in whole or in part), and for all other and further relief, special and general, at law and in equity, to which Plaintiffs may be so justly entitled.

*(Signature Block on Following Page)*

Respectfully submitted,

**THE FERGUSON LAW FIRM, LLP**
350 Pine Street, Suite 1440
Beaumont, Texas 77701
(409) 832-9700 – T
(409) 832-9704 – F

By: **/s/ Mark C. Sparks**
Mark C. Sparks
State Bar No. 24000273
mark@thefergusonlawfirm.com
Jane S. Leger
State Bar No. 00788814
jleger@thefergusonlawfirm.com
Jonathan "Tripp" Jones
State Bar No: 24097058
tjones@thefergusonlawfirm.com
William "Layne" Walker, Jr.
State Bar No. 24118580
lwalker@thefergusonlawfirm.com
**ATTORNEYS FOR PLAINTIFFS**

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been furnished to all counsel on this 29th day of June 2021 by electronic service, in accordance with LOCAL RULES and the FED. R. CIV. P.

David H. Timmins
State Bar No. 00785106
HUSCH BLACKWELL LLP
1900 N. Pearl St., Suite 1800
Dallas, TX 75201
(214) 999-6185 – T
(214) 999-6170 – F
david.timmins@huschblackwell.com

Mike Seely
Texas Bar No. 24054148
FOLEY & LARDNER LLP
1000 Louisiana Street | Suite 2000
Houston, TX 77002-2099
(713) 276-5979 – T
mseely@foley.com

Wayne B. Mason
Texas Bar No. 13158950
Susan Egeland
Texas Bar No. 24040854
Matt C. Sapp
Texas Bar No. 24063563
FAEGRE DRINKER BIDDLE & REATH LLP
1717 Main Street, Suite 5400
Dallas, Texas 75201
(469) 357-2500 – T
(469) 327-0860 – F
wayne.mason@faegredrinker.com
susan.egeland@faegredrinker.com
matt.sapp@faegredrinker.com
ATTORNEYS FOR INTERVENOR-DEFENDANT, CONTINENTAL CASUALTY COMPANY

/s/ Mark C. Sparks
Mark C. Sparks

## CERTIFICATE OF CONFERENCE

In accordance with Local Rule CV-7(h) I certify that the parties have "met and conferred" on Friday, June 25, 2021 and the Defendant is opposed to this motion.

/s/ Mark C. Sparks
Mark C. Sparks

## REQUEST FOR ORAL HEARING

Plaintiffs respectfully request the Court set this matter for oral hearing at the Court's first available time.

/s/ Mark C. Sparks
Mark C. Sparks