**UNITED STATES DISTRICT COURT**  **EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| JEREMY ROBISON, individually and on behalf of his son, R.R., a minor, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| *versus* | § § | CIVIL ACTION NO. 1:17-CV-508 |
| CONTINENTAL CASUALTY COMPANY, | § § | |
| Defendant. | § | |

### MEMORANDUM AND ORDER

Pending before the court is Defendant Continental Casualty Company's ("Continental") Motion for Summary Judgment (#143). Plaintiffs[1] filed a response (#166), and Continental filed a reply (#172). Plaintiffs also filed a supplement to their response (#206), to which Continental filed a reply (#213), and Plaintiffs filed a sur-reply (#215). Having considered the pending motion, the submissions of the parties, the record, and the applicable law, the court is of the opinion that the motion should be granted.

I.    Background

On January 28, 2016, students and staff members at Marshall Middle School ("MMS"), part of the Beaumont Independent School District ("BISD"), were exposed to carbon monoxide that leaked from a boiler and spread through the school's ventilation system. According to a post-incident report, 175 students and staff members received treatment for carbon monoxide exposure from emergency medical services at the scene, 69 of whom were transported to local medical

---

[1] Plaintiffs are 61 individuals, including 2 individuals who were adults at the time of the carbon monoxide incident, 24 students who were minor children at the time of the incident but are now adults, 22 parents of the formerly minor children, and 13 students who were minor children at the time of the incident and remain minor children, represented by their parents or guardians.

facilities, and an estimated 105 individuals sought treatment at local medical facilities as walk-in patients.  In their Fifth Amended Complaint (#186), Plaintiffs assert claims for negligence, willful and wanton conduct, gross negligence, and negligent undertaking against Continental.[2]  Plaintiffs contend that Continental's "breach of its duties was reckless, willful, and wanton."

Specifically, Plaintiffs assert that Continental undertook and breached a duty to Plaintiffs under section 324A of the Restatement (Second) of Torts.  *See* RESTATEMENT (SECOND) OF TORTS § 324A.  According to Plaintiffs, Continental "undertook to perform duties owed by BISD to its students . . . to render services such as inspection and certification of the boiler and its appurtenances, including, *inter alia*, the combustion safety interlock device as well as safety inspections, maintenance, and testing evaluations of boilers . . . pursuant to [s]ection 65.12 of the Texas Boiler Act," and to "provide students with a safe, clean and functional learning environment, that it knew or should have known were necessary for the Plaintiffs' protection and safety."  Plaintiffs claim that Continental failed to exercise reasonable care in performing these duties, which increased the risk of harm to students, faculty, and others at MMS, and that Plaintiffs suffered harm because they relied on Continental's undertaking to "make safe the physical condition" of the school.

Plaintiffs allege that at the time of the incident, Continental insured the boilers and performed the most recent inspection of the MMS boiler at issue in this case ("Boiler 840"). Indeed, on November 5, 2015—84 days before the carbon monoxide emission—Continental's

---

[2] Plaintiffs also sued Harris County Department of Education ("HCDE") and OneCIS Insurance Companies ("OneCIS").  On May 9, 2018, however, the court found that HCDE was improperly joined to the case and dismissed HCDE as a defendant (#67).  On May 10, 2018, the court granted the parties' joint motion to dismiss OneCIS as a defendant (#70).

inspector, Shannon Nester ("Nester") performed an inspection of Boiler 840.  Plaintiffs claim that Nester was "charged with ensuring Boiler 840 was fit to operate with a working interlock safety device" under the relevant statutory boiler regulations.[3]  Texas boilers are regulated by the Texas Department of Licensing and Regulation ("TDLR").  TDLR's Chief Boiler Inspector, Robby Troutt ("Troutt"), conducted an investigation after the incident.

On June 29, 2021, Continental filed its Motion for Summary Judgment (#143), seeking summary judgment on the following grounds:

(1)    Continental is entitled to sovereign immunity for the state-mandated boiler inspections (also called "jurisdictional inspections") because Continental performs those inspections under authority delegated by state law and Continental was acting on behalf of and at the direction of the State of Texas in performing those inspections as an authorized inspection agency;

(2)    Continental owed no duty to Plaintiffs for the state-mandated inspection because Continental's conduct did [not] satisfy any of the elements for section 324A's "undertaking" duty; and

(3)    Continental did not breach any duty that resulted in any injury because its inspector complied with the Texas Boiler Law, as acknowledged by the Chief Boiler Inspector of the State of Texas.

## II.    Analysis

### A.    Summary Judgment Standard

A party may move for summary judgment without regard to whether the movant is a claimant or a defending party.  *See Dillon Gage, Inc. of Dall. v. Certain Underwriters at Lloyds*, 992 F.3d 401, 403 (5th Cir. 2021); *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 380 (5th Cir. 2019); *Apache Corp. v. W&T Offshore, Inc.*, 626 F.3d 789, 793 (5th Cir. 2010);

---

[3] According to Plaintiffs, an interlock is a safety device that connects a boiler and its ventilation fans and prevents a boiler from operating when it does not have adequate ventilation.

*CQ, Inc. v. TXU Mining Co., L.P.*, 565 F.3d 268, 272 (5th Cir. 2009).  Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *United Steel, Paper & Forestry, Rubber Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Anderson*, 9 F.4th 328, 331 (5th Cir. 2021); *Smith v. Harris County*, 956 F.3d 311, 316 (5th Cir. 2020); *Parrish*, 917 F.3d at 378; *Hefren v. McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Playa Vista Conroe v. Ins. Co. of the W.*, 989 F.3d 411, 417 (5th Cir. 2021); *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019); *Mabry v. Lee County*, 849 F.3d 232, 234 (5th Cir. 2017).  To warrant judgment in its favor, the movant "must establish beyond peradventure *all* of the essential elements of the claim or defense." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020) (quoting *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017)); *accord Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011), *cert. denied*, 568 U.S. 1194 (2013).  At the summary judgment stage, the defendant "bears the burden of proving each element of each affirmative defense by a preponderance of the evidence." *Petro Harvester Operating Co., L.L.C. v. Keith*, 954 F.3d 686, 697 (5th Cir. 2020) (citing *Celotex Corp.*, 477 U.S. at 322-23).

"A fact issue is material if its resolution could affect the outcome of the action." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015) (quoting *Burrell v. Dr.*

*Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)), *cert. denied*, 136 S. Ct. 1715 (2016); *see Lexon Ins. Co., Inc. v. Fed. Deposit Ins. Corp.*, 7 F.4th 315, 321 (5th Cir. 2021); *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020); *Parrish*, 917 F.3d at 378. "Factual disputes that are irrelevant or unnecessary will not be counted." *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *accord Valencia v. Davis*, 836 F. App'x 292, 296 (5th Cir. 2020). "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Gerhart v. Barnes,* 724 F. App'x 316, 321 (5th Cir. 2018) (quoting *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)), *cert. denied*, 139 S. Ct. 1239 (2019); *accord Hudspeth v. City of Shreveport*, 270 F. App'x 332, 334 (5th Cir. 2008); *see Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hefren*, 820 F.3d at 771; *accord Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc.*, 7 F.4th 301, 309 (5th Cir. 2021); *Dyer*, 964 F.3d at 379; *Tiblier*, 743 F.3d at 1007. The moving parties, however, "need not negate the elements of the nonmovant's case." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014); *see Savoy v. Kroger Co.*, 848 F. App'x 158, 160 (5th Cir. 2021)*; Stout v. Vincent*, 717 F. App'x 468, 470 (5th Cir. 2018) (citing *Celotex Corp.*, 477 U.S. at 323).

Once a proper motion has been made, the nonmoving parties may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to demonstrate the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n.3; *see Beard v. Banks*, 548 U.S. 521, 529 (2006) (quoting Fed. R. Civ. P. 56(e)); *Clark v. CertainTeed Salaried Pension Plan*, 860 F. App'x 337, 340-41 (5th Cir. 2021); *Acadian*

*Diagnostic Labs., L.L.C. v. Quality Toxicology, L.L.C.*, 965 F.3d 404, 410 (5th Cir. 2020); *Smith*, 956 F.3d at 316 (quoting *James v. State Farm Mut. Auto. Ins. Co.*, 743 F.3d 65, 68 (5th Cir. 2014)); *Hassen v. Ruston La. Hosp. Co., L.L.C.*, 932 F.3d 353, 356 (5th Cir. 2019).  The court "should review the record as a whole." *Black v. Pan Am. Labs., LLC*, 646 F.3d 254, 273 (5th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)); *see Hacienda Records, L.P. v. Ramos*, 718 F. App'x 223, 234 (5th Cir. 2018)*; City of Alexandria v. Brown*, 740 F.3d 339, 350 (5th Cir. 2014).  All the evidence must be construed in the light most favorable to the nonmoving parties, and the court will not weigh the evidence or evaluate its credibility.  *Reeves*, 530 U.S. at 150; *Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021); *Lyons*, 964 F.3d at 302; *Nall*, 917 F.3d at 340; *Tiblier*, 743 F.3d at 1007.  The evidence of the nonmovants is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in their favor.  *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (citing *Anderson*, 477 U.S. at 255); *Batyukova*, 994 F.3d at 724; *Lyons*, 964 F.3d at 302; *Hassen*, 932 F.3d at 355; *Davenport v. Edward D. Jones & Co., L.P.*, 891 F.3d 162, 167 (5th Cir. 2018).  The evidence is construed "in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 435 (5th Cir. 2013) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005); *accord Lexon Ins. Co., Inc.*, 7 F.4th at 321; *Geovera Specialty Ins. Co. v. Odoms*, 836 F. App'x 197, 200 (5th Cir. 2020) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Furthermore, the court's obligation to draw reasonable inferences "does not extend so far as to allow a wholly 'unreasonable inference' or one which amounts to 'mere speculation and

conjecture.'" *Mack v. Newton*, 737 F.2d 1343, 1351 (5th Cir. 1984) ("[A]n inference would be unreasonable if it would allow a jury to rest its verdict on mere speculation and conjecture." (quoting *Bridges v. Groendyke Transp., Inc.*, 553 F.2d 877, 879 (5th Cir. 1977))); *accord McGill v. BP Exploration & Prod., Inc.*, 830 F. App'x 430, 432 (5th Cir. 2020); *Batyukova*, 994 F.3d at 724 ("'Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation' will not survive summary judgment." (quoting *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016))); *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 528 (5th Cir. 1999) ("If the [nonmoving party's] theory is . . . senseless, no reasonable jury could find in its favor, and summary judgment should be granted." (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468-69 (1992))); *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 779 (E.D. Tex. 2008) ("[O]nly reasonable inferences in favor of the nonmoving party can be drawn from the evidence." (citing *Eastman Kodak Co.*, 504 U.S. at 469 n.14))). "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill*, 805 F.3d at 538 (citing *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012)); *accord Allaudin v. Perry's Rests., Ltd.*, 805 F. App'x 297, 299 (5th Cir. 2020); *Acadian Diagnostic Labs., L.L.C.*, 965 F.3d at 410 (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Heath v. Elaasar*, 763 F. App'x 351, 354 (5th Cir. 2019).

Summary judgment is mandated if the nonmovants fail to make a showing sufficient to establish the existence of an element essential to their case on which they bear the burden of proof at trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322; *Lyons*,

964 F.3d at 302; *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 560 (5th Cir. 2019); *Tiblier*, 743 F.3d at 1007; *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013).  "[W]here the nonmoving party fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, no genuine issue of material fact can exist."  *Goode v. Greenstream Int'l, L.L.C.*, 751 F. App'x 518, 521 (5th Cir. 2018) (quoting *Nichols v. Enterasys Networks, Inc.*, 595 F.3d 185, 195 (5th Cir. 2007)); *see Phillips v. Sanofi U.S. Servs. (In re Taxotere (Docetaxel) Prods. Liab. Litig.)*, 994 F.3d 704, 710 (5th Cir. 2021); *Apache Corp.*, 626 F.3d at 793.  In such a situation, "'[a] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial' and 'mandates the entry of summary judgment' for the moving party."  *Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018) (quoting *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir.)), *cert. denied*, 139 S. Ct. 2690 (2019); *accord Stingley v. Watson Quality Ford*, 836 F. App'x 286, 288 (5th Cir. 2020).

    B.    <u>Sovereign Immunity</u>

    As an initial matter, Continental asserts that it is entitled to sovereign immunity against Plaintiffs' claims.  In Texas, it has long been recognized that sovereign immunity, unless waived, protects the State, its agents, and its officials from lawsuits for damages.  *See Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 839 (Tex. 2018); *Tex. Dep't of Transp. v. York*, 284 S.W.3d 844, 846 (Tex. 2009); *City of El Paso v. Heinrich*, 284 S.W.3d 366, 369 (Tex. 2009).  A governmental entity has sovereign immunity and cannot be held liable for the actions of its employees unless there is a constitutional or statutory provision waiving such immunity.  *Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 384 (Tex. 2016) ("The state or governmental unit can

be sued only if the Legislature waives immunity in 'clear and unambiguous language.'" (citing TEX. GOV'T CODE § 311.034)); *accord Harris County v. Annab*, 547 S.W.3d 609, 613 (Tex. 2018); *City of Watauga v. Gordon*, 434 S.W.3d 586, 589 (Tex. 2014). "Sovereign immunity protects the state and its various divisions, such as agencies and boards, from suit and liability, whereas governmental immunity provides similar protection to the political subdivisions of the state, such as counties, cities, and school districts." *Annab*, 547 S.W.3d at 612 (quoting *Travis Cent. Appraisal Dist. v. Norman*, 342 S.W.3d 54, 57-58 (Tex. 2011)); *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 n.2 (Tex. 2008); *see* TEX. CIV. PRAC. & REM. CODE § 101.001(3) (defining "governmental unit"); *Calhoun v. Villa*, 761 F. App'x 297, 300 (5th Cir. 2019); *Hays St. Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697, 703 (Tex. 2019).

The Texas Supreme Court, however, has repeatedly rejected the extension of immunity to private entities performing governmental functions. *See Univ. of Incarnate Word v. Redus*, 602 S.W.3d 398, 401 (Tex. 2020) ("We have yet to extend sovereign immunity to a purely private entity—one neither created nor chartered by the government—even when that entity performs some governmental functions."); *Nettles v. GTECH Corp.*, 606 S.W.3d 726, 738 (Tex. 2020); *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 752 (Tex. 2019); *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 129 (Tex. 2015). The Texas Supreme Court has analyzed "sovereign immunity in three contexts outside the State government: political subdivisions, legislatively authorized entities, and government contracts." *Univ. of Incarnate Word*, 602 S.W.3d at 404. "An entity claiming governmental immunity must ordinarily be a political subdivision." *Rosenberg Dev. Corp.*, 571 S.W.3d at 748.

> In analyzing legislatively authorized entities that are not political subdivisions, [the court] consider[s] whether the authorizing statute "evinces clear legislative intent" to vest the entity with the "nature, purposes, and powers" of an "arm of the State government." If so vested, "that entity is a government unit unto itself" and is "entitled to assert immunity in its own right" when it performs a government function. If, however, an entity's underlying "nature, purposes, and powers" are not congruent with an arm of State government, then the legislature cannot "de facto grant" it sovereign immunity.

*Univ. of Incarnate Word*, 602 S.W.3d at 405 (quoting *Rosenberg Dev. Corp.*, 571 S.W.3d at 749-50); *Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Pol. Subdivisions Prop./Cas. Joint Self-Ins. Fund,* 212 S.W.3d 320, 325-26 (Tex. 2006). Thus, the relevant considerations in determining whether a private entity is entitled to sovereign immunity are "whether the entity acted as an arm of the State government and whether affording it sovereign immunity fits within the doctrine's underlying nature and purposes." *Univ. of Incarnate Word*, 602 S.W.3d at 401.

State action can occur when a "nominally private entity . . . is controlled by an 'agency of the State,'" or when it has been delegated a public function by the State. *Brentwood v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Pennsylvania v. Bd. of Dirs. of City Trusts of Phila.*, 353 U.S. 230, 231 (1957) (citing *West*, 487 U.S. at 56; *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 627-28 (1991))). Under the public function test, a private entity may be deemed a state actor when that entity performs a function that is traditionally the exclusive province of the State. *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019), *aff'd*, 821 F. App'x 317 (5th Cir. 2020); *Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir. 1989); *La. Div. Sons of Confederate Veterans v. City of Natchitoches,* 370 F. Supp. 3d 692, 703 (W.D. La. 2019). In addition, state action may be found when a private entity is "'entwined with governmental policies' or when government is 'entwined in [its] management or control.'"

*Brentwood*, 531 U.S. at 296 (quoting *Evans v. Newton*, 382 U.S. 296, 299, 301 (1966)); *Magliulo v. Edward Via Coll. of Osteopathic Med.*, ___ F. Supp. 3d ___, No. 3:21-CV-2304, 2021 WL 3679227, at *8 (W.D. La. Aug. 17, 2021). The Supreme Court has recognized that although an organization appears to be private, it may be an arm of the State through "winks and nods." *Brentwood*, 531 U.S. at 302 n.4 (stating that "if formalism were the sine qua non of state action, the doctrine would vanish owing to the ease and inevitability of evasion, and for just that reason formalism has never been controlling"). Nevertheless, "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action." *U.S. Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 154-65 (1978); *Jackson v Metro. Edison Co.*, 419 U.S. 345, 357 (1974)).

A private business is not transformed into a state actor merely by statutory regulation. *See Blum*, 457 U.S. at 1004 (quoting *Jackson*, 419 U.S. at 350 (stating that "the mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment")). Rather, constitutional standards may be invoked only "when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Id.* A private entity is not entitled to sovereign immunity solely because the legislature has authorized it to enforce state law through commissioned employees or contractors. *Brown & Gay Eng'g*, 461 S.W.3d at 125-26 ("[W]e cannot adopt [the plaintiff]'s contention that it is entitled to share in the [State's] sovereign immunity solely because the [State] was statutorily authorized to engage [the plaintiff]'s services and would have been immune had it performed those services itself."). The private status of an entity engaging in a governmental function that is "only

11

one part of its overall operations[] undermines the notion that [it] is an 'arm of the State' government." *Univ. of Incarnate Word*, 602 S.W.3d at 406-07 (holding that a private university's commissioned peace officers were not entitled to sovereign immunity because the university did not act as an arm of the State in its overall operations, despite the fact that the Texas Education Code authorizes private universities to commission and employ peace officers).  An entity that "exclusively performs functions assigned by the legislature and does not market its services to any other use," however, may be entitled to sovereign immunity.  *See Elec. Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 552 S.W.3d 297, 314 (Tex. App.—Dallas 2018, pet. dism'd w.o.j.).

In government contractor cases, the government's control and the contractor's discretion are important factors in determining whether to extend sovereign immunity to a private entity. *Nettles*, 606 S.W.3d at 732.  "Courts that have considered the possibility of contractor immunity have looked to the pleadings; does the suit complain of a governmental decision the contractor was implementing, or of the manner in which the contractor performed a contractual obligation?" *Id.* If it is the latter, the private contractor is not immune, as it is not entitled to immunity for the manner in which it chooses to carry out a governmental function. *Brown & Gay Eng'g, Inc.*, 461 S.W.3d at 125-26 (holding that an engineering firm was not entitled to immunity because the plaintiffs did not complain of the government's decision to build a tollway or of its existence but, rather, the firm's decisions in how it designed the tollway's safeguards).  The Texas Supreme Court has indicated that this control test is also "instructive" in cases where an entity is legislatively authorized. *Univ. of Incarnate Word*, 602 S.W.3d at 407.

Moreover, immunity "preserves separation-of-powers principles by preventing the judiciary from interfering with the Legislature's prerogative to allocate tax dollars." *Brown & Gay Eng'g, Inc.*, 461 S.W.3d at 121.  The purpose of sovereign immunity is to "protect[] the public as a whole by preventing potential disruptions of key government services that could occur when government funds are unexpectedly and substantially diverted by litigation." *Id.*; *see Rosenberg*, 571 S.W.3d at 740-41.  Conferring immunity on a private entity, however, does not serve the purposes of sovereign immunity where a plaintiff's suit does not "threaten allocated government funds." *Brown & Gay Eng'g, Inc.*, 461 S.W.3d at 127; *accord Univ. of Incarnate Word*, 602 S.W.3d at 409.

In its motion for summary judgment, Continental contends that it is entitled to sovereign immunity because the claims against Continental "are based upon the state-mandated boiler inspections that Continental performs as an arm of the state under statutory authority delegated to it by the Texas Boiler Law and Rules."  Continental further asserts that Texas law extends the same doctrine of sovereign immunity "that protects the state itself to a private entity that performs those functions on behalf of the state."

Texas law governing boilers is set forth in Texas Health & Safety Code chapter 755 (the "Texas Boiler Law") and in Texas Administrative Code chapter 65 (the "Texas Boiler Rules"). TEX. HEALTH & SAFETY CODE § 755; 16 TEX. ADMIN. CODE § 65.  The Texas Boiler Rules mandate that:

> Boilers shall be inspected by the inspection agency that issued an insurance policy to cover a boiler located in this state, or authorized representative.  All other boilers shall be inspected by the department.[4]

16 TEX. ADMIN. CODE § 65.61(b).  Boiler inspectors employed by insurance companies are commissioned by the state to perform inspections.  *Id.* §§ 65.14, 65.90.  They must meet various requirements set forth by the state to hold a commission, including at least five years' experience, passing a test on the Texas Boiler Law and Rules, working for an entity that is approved by the TDLR, and meeting individually with the Chief Boiler Inspector.  *See id.* §§ 65.14, 65.25.  Notably, courts in other jurisdictions with similar state boiler inspection laws have held that boiler inspectors employed by insurance companies are not entitled to immunity for boiler inspections performed for state certification purposes.  *See, e.g. Hartford Steam Boiler Inspection & Ins. Co. v. White*, 775 N.E.2d 1128, 1137 (Ind. Ct. App. 2002) (holding that inspectors performing boiler inspections for certification purposes are not entitled to immunity under Indiana law), *trans. denied*; *Logestan v. Hartford Steam Boiler Inspection & Ins. Co.*, 626 N.E.2d 829, 834 (Ind. Ct. App. 1993) (same), *trans. denied*.

Here, Continental is a purely private entity legislatively authorized to conduct boiler inspections pursuant to the Texas Boiler Law and Rules.  The authorizing statutes, however, give no indication that the legislature intended boiler inspectors employed by insurance companies to be entitled to sovereign immunity.  Further, boiler inspections comprise only a small part of Continental's overall operations as an insurance company.  This fact weighs against concluding that Continental operates as an arm of the Texas government.

---

[4] The 2015 version of the Texas Boiler Rules were in effect at the time of the carbon monoxide incident and are applied herein where they differ from the current version.

14

Moreover, Continental's argument fails under the control test.  Plaintiffs do not complain of the existence of the boiler laws and inspection requirements but rather Continental's actions in carrying out the inspection.  Continental had discretion in how it completed the inspection and is "responsible for its own negligence," if any, "as a cost of doing business."  *Brown & Gay Eng'g, Inc.*, 461 S.W.3d at 127.  Furthermore, because Continental is a private entity, Plaintiffs' lawsuit does not jeopardize government funds or raise separation-of-powers concerns.  Thus, extending sovereign immunity to Continental would not further the doctrine's purposes, and summary judgment with respect to Continental's sovereign immunity claim is not warranted.

C.    Duty Under a Negligent Undertaking Theory

Under Texas law, a negligence claim consists of four essential elements:

(1) a legal duty owed to the plaintiff by the defendant;
(2) a breach of that duty;
(3) an actual injury to the plaintiff; and
(4) a showing that the breach was the proximate cause of the injury.

*Eckhardt v. Qualitest Pharm., Inc.*, 751 F.3d 674, 681 (5th Cir. 2014) (quoting *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006)); *see Milligan v. Home Depot USA, Inc.*, 809 F. App'x 217, 219 (5th Cir. 2020); *Espinoza v. Cargill Meat Sols. Corp.*, 622 F.3d 432, 443 (5th Cir. 2010); *Boudreaux*, 402 F.3d at 540-41; *In re Oncor Delivery Co. LLC*, 630 S.W.3d 40, 43 (Tex. 2021); *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 352 (Tex. 2015).  "[T]he existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question."  *Allen v. Walmart Stores, L.L.C.*, 907 F.3d 170, 178 (5th Cir. 2018) (quoting *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)); *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 503 (Tex. 2017).  If the defendant owed no duty, it cannot

15

be found liable for negligence. *Allen*, 907 F.3d at 180; *Boudreaux*, 402 F.3d at 542 n.19; *Thapar v. Zezulka*, 994 S.W.2d 635, 637 (Tex. 1999).

"A duty is a legally enforceable obligation to conform to a particular standard of conduct." *Bauer v. Gulshan Enters., Inc.*, 617 S.W.3d 1, 22 (Tex. App.—Houston [1st Dist.] 2020, pet. denied); *San Benito Bank & Tr. Co. v. Landair Travels*, 31 S.W.3d 312, 317 (Tex. App.—Corpus Christi 2000, no pet.); *accord City of Houston v. Jenkins*, 363 S.W.3d 808, 817 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). "A duty can be assumed by contract or imposed by law." *J.P. Morgan Chase Bank, N.A. v. Tex. Cont.Carpet, Inc.*, 302 S.W.3d 515, 530 (Tex. App.—Austin 2009, no pet.). Whether a duty exists "turns 'on a legal analysis balancing a number of factors, including the risk, foreseeability, and likelihood of injury, and the consequences of placing the burden on the defendant.'" *Austin v. Kroger Tex. L.P.*, 746 F.3d 191, 198 (5th Cir. 2014) (quoting *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 767 (Tex. 2010)); *accord Bauer*, 617 S.W.3d at 22; *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 218 (Tex. 2008). Of these factors, foreseeability of the risk is the dominant consideration. *Boudreaux*, 402 F.3d at 541; *Greater Hous. Transp. Co.*, 801 S.W.2d at 525. Nevertheless, "foreseeability alone is not sufficient to justify the imposition of a duty." *W. Hous. Airport v. Millennium Ins. Agency, Inc.*, 349 S.W.3d 748, 754 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (citing *City of Waco v. Kirwan*, 298 S.W.3d 618, 624 (Tex. 2009)); *accord HNMC, Inc. v. Chan*, ___S.W.3d___, No. 14-18-00849-CV, 2020 WL 2832780, at *8 (Tex. App.—Houston [14th Dist.] May 28, 2020, no pet.); *Gatten v. McCarley*, 391 S.W.3d 669, 676 (Tex. App.—Dallas 2013, no pet.).

"Generally, there is 'no duty to take action to prevent harm to others absent certain special relationships or circumstances.'" *Landrum v. Three Aces Towing, Inc.*, 628 S.W.3d 346 (Tex. App.—Houston [14th Dist.] 2021, pet. filed) (quoting *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000)); *Gonzales v. O'Brien*, 305 S.W.3d 186, 189 (Tex. App.—San Antonio 2009, no pet.).    The court, however, may "recognize a new duty based on the risk-utility balancing test." *Id.*   "[T]he nature of the relationship between the plaintiff and defendant is a significant consideration in determining the existence of a duty of care." *W. Hous. Airport*, 349 S.W.3d at 754 (citing *Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 34 (Tex. 2002)).   In determining whether to recognize a new duty, courts also consider:  (1) whether one party had a superior knowledge of the risk, (2) whether a party had a right to control the conduct of another, (3) whether societal changes require the recognition of new duties, (4) whether the creation of a new duty would be in conflict with existing statutory law, and (5) whether there are countervailing concerns that would support or hinder the recognition of a new duty.  *Kalinchuk v. JP Sanchez Constr. Co.*, No. 04-15-00537-CV, 2016 WL 4376628, at *3 (Tex. App.—San Antonio Aug. 17, 2016, no pet.) (quoting *Gonzales*, 305 S.W.3d at 189-90). "[A] mere bystander who did not create the dangerous situation is not required to become the good Samaritan and prevent injury to others." *Abalos v. Oil Dev. Co. of Tex.*, 544 S.W.2d 627, 633 (Tex. 1976) (quoting *Buchanan v. Rose*, 159 S.W.2d 109, 110 (Tex. 1942))); *Mendez v. Hous. Harris Area Safety Council, Inc.*, 634 S.W.3d 154, 161 (Tex. App.—Houston [1st Dist.] 2021, pet. filed); *Newsom v. B.B.*, 306 S.W.3d 910, 916 (Tex. App.—Beaumont 2010, no pet.).   "The law does not require a person to anticipate negligent or unlawful conduct on the part of another." *Gonzales v. Trinity Indus., Inc.*,

7 S.W.3d 303, 307 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (citing *De Winnie v. Allen*, 277 S.W.2d 95, 98 (Tex. 1955)).

Generally, however, "one who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other[] person . . . will not be injured thereby." *Poynor v. BMW of N. Am., LLC*, 383 S.W.3d 201, 205 (Tex. App.—Dallas 2012, no pet.) (citing *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 395-96 (Tex. 1991)). The Restatement (Second) of Torts states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking if (a) his failure to exercise reasonable care increases the risk of harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

RESTATEMENT (SECOND) OF TORTS § 324A; *see Knife River Corp.-S. v. Hinojosa*, 438 S.W.3d 625, 632 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *Poynor*, 383 S.W.3d at 205 (citing section 324A favorably); *Seay v. Travelers Indem. Co.*, 730 S.W.2d 774, 775-76 (Tex. App.—Dallas 1987, no writ). Stated differently, a negligent undertaking duty arises when (1) a defendant undertakes to perform services it knew or should have known were necessary for the plaintiff's protection; (2) the defendant failed to exercise reasonable care in performing those services; and (3) the plaintiff relied on the defendant's performance or the defendant's performance increased the plaintiff's risk of harm. *Nall v. Plunkett*, 404 S.W.3d 552, 556 (Tex. 2013); *Kenyon v. Elephant Ins. Co., LLC*, 628 S.W.3d 868, 892 (Tex. App.—San Antonio 2020, pet. granted).

This tort principle has been cited by courts applying Texas law.  *See Bauer*, 617 S.W.3d at 22; *ENGlobal U.S., Inc. v. Gatlin*, 449 S.W.3d 269, 280 (Tex. App.—Beaumont 2014, no pet.) (recognizing section 324A as "a valid theory of liability under Texas law"); *Little v. Delta Steel, Inc.*, 409 S.W.3d 704, 717-18 (Tex. App.—Fort Worth 2013, no pet.) (applying section 324A to a negligence case brought under Texas law).  Indeed, under section 324A, a company may assume a duty to protect another's employees when it exercises control over the safety and security of the related entity and its employees.  *See Little*, 409 S.W.3d at 717 (opining that parent corporations with "the right to control or actually control safety and security policies of the [subsidiary's] workplace have a duty to the workers to maintain a safe workplace"); *see also In re DuPuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 783 (5th Cir. 2018) (recognizing that a parent corporation may owe a duty to protect its subsidiary's employees where it has undertaken to do so (citing *Johnson v. Abbe Eng'g Co.*, 749 F.2d 1131, 1133 (5th Cir. 1984))).

"The critical inquiry concerning the duty element of a negligent-undertaking theory is whether a defendant acted in a way that requires the imposition of a duty where one otherwise would not exist."  *Nall*, 404 S.W.3d at 555 (citing *Torrington Co.*, 46 S.W.3d at 838-39).  A duty arises if a defendant affirmatively undertakes to perform services "upon which reliance can be based."  *Bauer*, 617 S.W.3d at 22.  The scope of a defendant's undertaking duty is limited to the task it has undertaken to perform.  *Torrington Co.*, 46 S.W.3d at 839; *Knife River Corp.-S.*, 438 S.W.3d at 634.  "A mere promise to render a service coupled with neither performance nor reliance imposes no tort obligation upon the promisor."  *Fort Bend Cnty. Drainage Dist.*, 818 S.W.2d at 396.

19

In this case, Continental asserts that it did not owe Plaintiffs a duty because it did not voluntarily undertake a duty under the Restatement (Second) of Torts section 324A. Specifically, it maintains that section 324A is inapplicable in this case because Continental did not undertake BISD's duty of providing a safe environment to its students and staff, Nester's inspection did not increase the risk of harm to Plaintiffs, and neither BISD nor the students and staff at MMS reasonably relied on Continental's inspection because BISD was ultimately responsible for their safety. Continental also contends that because it conducted the inspection pursuant to statutory authority, the undertaking was not voluntary and, thus, cannot satisfy section 324A.

Boilers operated in the state of Texas must be registered with the TDLR and have a "current certificate of operation." 16 TEX. ADMIN. CODE § 65.12. This certificate ensures the boiler's safety and is issued after the boiler passes a state boiler inspection. *Id.* § 65.15. As discussed above, insurance companies employ individual inspectors to perform boiler inspections pursuant to the Texas Boiler Law and Rules. *Id.* § 65.61(b). Insurance services are generally provided for the insured's benefit or protection. *Kenyon*, 628 S.W.3d at 896; *see In re Deepwater Horizon*, 470 S.W.3d 452, 467 (Tex. 2015). "Thus, an insurance company can assume a negligent undertaking duty by performing certain insurance-related services for an insured." *Kenyon*, 628 S.W.3d at 893 (citing *Keightley v. Republic Ins. Co.*, 946 S.W.2d 124, 126 (Tex. App.—Austin 1997, no writ)); *Seay*, 730 S.W.2d at 775.

In *Seay*, the Dallas Court of Appeals reversed the district court's grant of summary judgment in favor of Defendant Travelers Insurance Company ("Travelers"), ultimately holding that there was a fact issue regarding whether Travelers owed a duty to others by inspecting boilers. Seay, a maintenance employee of the hospital, who was performing maintenance work on one of

20

the boilers, suffered fatal injuries when the boiler's safety valve released and ejected scalding water onto him. *Id*. at 775. Seay's heirs brought suit against Travelers, claiming that it negligently inspected the boilers, causing Seay's death. *Id*. In its motion for summary judgment, Travelers asserted that it did not undertake a duty to the employees of a hospital it insured and where it inspected the boilers. *Seay*, 730 S.W.2d at 780.

Travelers filed a motion for summary judgment asserting it owed no duty to Seay. *Id*. Seay's heirs countered that Travelers undertook the duty to inspect the boiler and owed Seay a duty pursuant to section 324A of the Restatement (Second) of Torts. *Id*. The Dallas Court of Appeals held:

> The [Boiler] Act clearly contemplates that an entity operating a boiler obtain a "certificate of operation" assuring the safety of the boiler as a predicate to such operation. In order to receive the "certificate," [the hospital] was obligated to have the boiler inspected. The State Inspectors are not obligated to "make rounds" and uncover boilers in need of inspection. Therefore, since [the hospital] obtained Travelers to perform the inspection, Travelers performed acts which were required of [the hospital] under the provisions of the Act designed to promote the safety of boilers. Consequently, the evidence fails to disprove that Travelers was performing a duty of care owed by [the hospital] to its employees, including the decedent.

*Id*. at 780.

The court finds the holding in *Seay* persuasive. Here, two of the plaintiffs were BISD employees at the time of the carbon monoxide release. At a minimum, there is a fact issue as to whether Continental, as an insurer, owed a duty of care with respect to boiler inspections to BISD, its employees, and its students. Indeed, Continental does not dispute that it owed a duty to BISD. Further, Texas courts have held that a defendant may owe an undertaking duty to third parties. *Id*. at 776 ("Texas courts 'have repeatedly recognized that existence of a duty will not be defeated

by the fact that the duty is claimed by a third party not in privity with the transaction giving rise to the tort.'"); *see Bujnoch v. Nat'l Oilwell Varco, L.P.,* 542 S.W.3d 2, 11-12 (Tex. App.—Houston [14th Dist.] 2017, pet. denied); *Steward v. Costello,* No. 05-02-00679-CV, 2003 WL 115453, at *2 (Tex. App.—Dallas Jan. 14, 2003, no pet.) (holding that a company that loaded and secured pipes into vehicle for another had undertaken a duty toward a third-party motorist); *C & H Nationwide, Inc. v. Thompson*, 810 S.W.2d 259, 266-67 (Tex. App.—Houston [1st Dist.] 1991) (same), *rev'd on other grounds*, 903 S.W.2d 215 (Tex. 1994).

Clearly, boiler inspections serve the purpose of ensuring that boilers operate safely. *Seay*, 730 S.W.2d at 779; *see* TEX. HEALTH & SAFETY CODE § 755.041. Troutt testified that the purpose of boiler inspections is "[t]o ensure they're safe and they have all the safety appurtenances that are required by the Texas Boiler Law and Rules." Nester, Continental's inspector, testified that he understood his inspection of Boiler 840 was for code compliance, which "protects the vessel, which [in turn] protects equipment and property and people." Continental could reasonably foresee that if the boiler was not safe, it could malfunction and injure those on the school premises. Thus, Continental could reasonably foresee that BISD would rely on it to ensure, through its inspection, that the boiler was safe to operate for the benefit of those on the premises of MMS, including staff and students. Indeed, BISD's representative, Mark McClelland, testified that BISD and MMS relied on Continental's boiler inspections because the school's maintenance staff had no expertise in boiler inspections or interlock devices and were not qualified to perform inspections. By extension, it was reasonably foreseeable that the MMS staff and students were third persons at an increased risk stemming from any failure by Continental to exercise reasonable

care in performing the inspection. Therefore, Continental has not met its summary judgment burden to negate the element of duty as a matter of law.

### D.    Breach of Duty and Proximate Cause

Continental asserts that Plaintiffs have failed to establish that it breached a duty to them or that any purported breach caused Plaintiffs' harm. Continental maintains that it did not breach any duty to Plaintiffs because Nester's inspection complied with the Texas Boiler Law and Rules requirements. Plaintiffs respond that Continental's "inadequate boiler inspection caused the CO release" because Nester failed to activate the boiler to check whether the interlock was connected to the fans and functioning properly. Continental, in turn, asserts that Plaintiffs have failed to present any evidence that Nester's conduct during the inspection caused the carbon monoxide release. The parties dispute whether Nester was required to turn on the boiler to test the interlock device during his inspection pursuant to the Texas Boiler Law and Rules; whether the interlock was properly connected to the boiler during the inspection; and whether Nester's conduct was a proximate cause of the carbon monoxide leak.

To prevail on their negligence claim, Plaintiffs must show that Continental caused Plaintiffs' injuries. In Texas, proof of negligence requires a showing of proximate cause. *Bos v. Smith*, 556 S.W.3d 293, 303 (Tex. 2018); *HMC Hotel Props. II Ltd. P'ship v. Keystone Tex. Prop. Holding Corp.*, 439 S.W.3d 910, 913 (Tex. 2014); *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005); *Munoz v. City of Pearsall*, 64 S.W.3d 119, 123 (Tex. App.—San Antonio 2001, no pet.) (citing *Union Pump Co. v. Albritton*, 898 S.W.2d 773, 775 (Tex. 1995)). A plaintiff asserting negligent undertaking "must also prove that the defendant's breach proximately caused the plaintiff's injuries." *Doe v. Messina*, 349 S.W.3d 797, 800 (Tex. App.—Houston

23

[14th Dist.] 2011, pet. denied); *see Torrington Co.*, 46 S.W.3d at 838.  Proximate cause consists of two elements—cause in fact and foreseeability.  *Villafranca v. United States*, 587 F.3d 257, 265 (5th Cir. 2009) (citing *IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004)); *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 519 (Tex. 2019); *HMC Hotel Props. II Ltd. P'ship*, 439 S.W.3d at 913; *W. Invs., Inc.*, 162 S.W.3d at 551.  "The cause in fact element is satisfied by proof that (1) the act was a substantial factor in bringing about the harm at issue, and (2) absent the act ('but-for' the act), the harm would not have occurred."  *HMC Hotel Props. II Ltd. P'ship*, 439 S.W.3d at 913 (citing *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d. 106, 122 (Tex. 2009)); *accord Knight Oil Tools, Inc. v. Rippy Oil Co.*, No. 10-18-00284-CV, 2021 WL 5235149, at *2 (Tex. App.—Waco Nov. 10, 2021, no pet.).  "Cause in fact is not established where the defendant's negligence does no more than furnish a condition which makes injuries possible."  *IHS Cedars Treatment Ctr.*, 143 S.W.3d at 799; *see Aguilar v. Morales*, 545 S.W.3d 670, 680 (Tex. App.—El Paso 2017, pet. denied); *Rodriguez v. Moerbe,* 963 S.W.2d 808, 818 (Tex. App.—San Antonio 1998, pet. denied) (citing *Union Pump Co.*, 898 S.W.2d at 776).

"Foreseeability exists if the actor, as a person of ordinary intelligence, should have anticipated the dangers his negligent act creates for others."  *Hulsey v. Attalla*, No. 01-18-00180-CV, 2019 WL 3484082, at *5 (Tex. App.—Houston [1st Dist.] Aug. 1, 2019, no pet.) (citing *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002)); *Barton v. Whataburger, Inc.*, 276 S.W.3d 456, 463 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).  It also requires that "the injured party is so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen."  *Taylor v. Louis*, 349 S.W.3d 729, 735

(Tex. App.—Houston [14th Dist.] 2011, no pet.) (citing *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 551 (Tex. 1985)). Foreseeability does not permit recollecting events and theorizing an extraordinary scenario where defendant's actions caused the injury. *Forrest v. Vital Earth Res.*, 120 S.W.3d 480, 490 (Tex. App.—Texarkana 2003, pet. denied) (citing *Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 737 (Tex. 1998)). Instead, the question "involves a practical inquiry based on 'common experience applied to human conduct.'" *Id.* (quoting *Read*, 990 S.W.2d at 737); *see Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992); *City of Austin v. Anam*, 623 S.W.3d 15, 18 (Tex. App.—Austin 2020, no pet.). Only the general danger, not the specific series of events that produced the harm, is required to establish foreseeability. *Kenyon*, 628 S.W.3d at 903; *Forrest*, 120 S.W.3d at 490 (citing *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996)); *Green v. City of Friendswood*, 22 S.W.3d 588, 595 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

Proximate cause is usually a mixed question of law and fact for the jury to determine. *Cherry v. Tex. Dep't of Crim. Just.*, 978 S.W.2d 240, 243 (Tex. App.—Texarkana 1998, no pet.) (citing *El Chico Corp. v. Poole*, 732 S.W.2d 306, 314 (Tex. 1987)); *accord Whitmire v. Terex Telelect, Inc.*, 390 F. Supp. 2d 540, 558 (E.D. Tex. 2005) (citations omitted); *see Forrest*, 120 S.W.3d at 490. Because "Texas courts usually consider proximate cause an issue for the jury," "it has been said that summary judgment procedure is not well adapted to the disposition of negligence cases." *Haangaard v. Harris County*, No. 01-20672, 2002 WL 755304, at *2 (5th Cir. Apr. 11, 2002) (citing *Boyd v. Fuel Distribs., Inc.*, 795 S.W.2d 266, 272 (Tex. App.—Austin 1990, writ denied)); *accord Whitmire*, 390 F. Supp. 2d at 558 (citing *Hennessy v. Perez*, 725 S.W.2d 507, 509 (Tex. App.—Houston [1st Dist.] 1987, no writ)). "Nonetheless, proximate

cause may be a question of law where the facts are conclusive." *Whitmire*, 390 F. Supp. 2d at 558 (citing *Purina Mills, Inc. v. Odell*, 948 S.W.2d 927, 935 (Tex. App.—Texarkana 1997, pet. denied)).

A plaintiff must establish proximate cause by probative evidence, not mere conjecture. *Gutierrez v. Excel Corp.* 106 F.3d 683, 687 (5th Cir. 1997); *see Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016); *Nelson v. Sheedy*, No. 05-16-01262-CV, 2018 WL 2434389, at *6 (Tex. App.—Dallas May 30, 2018, pet. denied). "Proximate cause, however, like any other ultimate fact issue, may be established by circumstantial evidence." *Forrest*, 120 S.W.3d at 490. In some circumstances, "[e]ven if the injury would not have happened but for the defendant's conduct, the connection between the defendant and the plaintiff's injuries may be too attenuated to constitute legal cause." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 623 F. Supp. 2d 798, 811 (S.D. Tex. 2009) (citing *Union Pump Co.*, 898 S.W.2d at 775). "[A] lack of proximate cause may be established as a matter of law if the evidence is without material dispute and the circumstances are such that reasonable minds could not arrive at a different conclusion." *Phillips v. Tex. Dep't of Crim. Just.*, 366 S.W.3d 312, 316 (Tex. App.—El Paso 2012, no pet.); *see Ambrosio v. Carter's Shooting Ctr., Inc.*, 20 S.W.3d 262, 266 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

Texas law establishes that an external inspection is "[a]n inspection of the exterior of a boiler and its appurtenances that is made, if possible, while the boiler is in operation." Tex. Health & Safety Code § 755.001(8); 16 Tex. Admin. Code § 65.2(27). Section 65.603 of the Texas Boiler Rules provides that "[t]he boiler and the fans shall be interlocked so that the burners will not operate unless a supply of combustion, ventilation, and dilution air as required by the

boiler manufacturer's recommendations."[5]  *See* 16 TEX. ADMIN. CODE § 65.603 (2015).  Troutt's

TDLR post-incident investigation report states the following:

> There were two (2) Power Ventilators (one Combustion and one Exhaust) installed in the Boiler Mechanical Room (Texas Boiler Rule 65.602 (b) requires power ventilator to be interlocked with the burners of the boilers to prevent operation if there is not adequate air supply).  The combustion air fan was non-operational and the exhaust fan was operational.  [T]his accident occurred as a result of two different failures.  First was the non-operational status of the power ventilation fans.  The second is due to the flame that was observed exiting the side of the boiler which was caused from corrosion of the fire box refractory.

Troutt concluded that the inoperative combustion fan caused the buildup and release of carbon

monoxide at MMS by creating negative pressure and air flow with the operative exhaust fan.

Post-incident, Troutt confirmed the presence of Boiler 840's interlock system, as did BISD's

corporate representative and the boiler manufacturer's representative.  According to Troutt, Boiler

840's interlock device did not directly connect the boiler and fans.  Rather, the interlock connected

the boiler and fans through two switches in the boiler room.  The first is similar to a light switch,

and is labeled "ventilation fans" with the up position labeled "manual" and the down position

labeled "automatic."  The second switch has three positions; the up position is labeled "on," the

middle position is labeled "off," and the down position is labeled "auto."  Notably, Troutt

testified that he was not "blaming" the interlock for the carbon monoxide release, but, rather, the

"combustion fan for going out and the exhaust fan for continuing to operate."  Additionally, a

plastic bag was found caught in one of the fans on the day of the emission.

---

[5] The statute has since been amended.  The current version of the statute states:  "The boiler and the fans shall be interlocked to disable the burners unless a supply of combustion, ventilation, and dilution air in accordance with the boiler manufacturer's recommendations is maintained."

Nester claims he performed an external inspection of Boiler 840. It is undisputed that he did not activate or request that the boiler be activated for the inspection. Nester testified that the fans were interlocked with the boiler and that he visually verified the interlock's presence by tracing the electrical conduit from the combustion fan to the boiler. After his inspection, Nester noted on the TDLR inspection form that Boiler 840 had no adverse conditions or violations. Troutt testified in his deposition that he believed the inspection performed by Nester was in compliance with the Texas Boiler Law and Rules and maintained that he had no criticisms of Nester's inspection. Moreover, Troutt stated that the Texas Boiler Law and Rules do not require inspectors to activate a boiler during an inspection.

1.    McDaniel's Reliance on Smith's Report

In addition to the Motion for Summary Judgment, Continental filed a separate motion to exclude Plaintiffs' boiler expert, McDaniel, from testifying as an expert.[6] The admission or exclusion of expert witness testimony is a matter that is left to the discretion of the district court. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see United States v. Herman*, 997 F.3d 251, 269 (5th Cir. 2021); *Hicks-Fields v. Harris County*, 860 F.3d 803, 810 n.22 (5th Cir.), *cert. denied*, 138 S. Ct. 510 (2017); *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009), *cert. denied*, 559 U.S. 1006 (2010); *Nano-Proprietary, Inc. v. Cannon, Inc.*, 537 F.3d 394, 399 (5th Cir. 2008). Pursuant to Rule 702 of the Federal Rules of Evidence:

---

[6] The court granted the motion in part and denied it in part, concluding that McDaniel may testify as to boiler design, condition, operation, and maintenance, but may not testify as to the applicable legal requirements and proper scope of state-mandated boiler inspections in Texas, the standard of care for boiler inspectors in Texas, the causation of the carbon monoxide discharge at MMS, or how Nester's alleged acts or omissions caused or contributed to the carbon monoxide emission incident.

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702; *accord Kumho Tire Co.*, 526 U.S. at 152; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993).  The trial court possesses considerable flexibility in assessing the reliability of expert testimony.  *Kumho Tire Co.*, 526 U.S. at 141; *United States v. Schaffer*, 439 F. App'x 344, 346 (5th Cir. 2011) (citing *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)); *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir.), *cert. denied*, 562 U.S. 893 (2010); *Alpizar v. John Christner Trucking, LLC*, ___ F. Supp. 3d ___, No. SA-17-CV-0712-JKP, 2021 WL 4943691, at *2 (W.D. Tex. Oct. 22, 2021).

"[E]xpert testimony based solely or primarily on the opinions of other experts is inherently unreliable."  *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 275 (E.D. La. 2014).  "It is only when the expert undertakes some independent investigation of the underlying opinions that his testimony may be considered reliable."  *Id.*  Simply put, a testifying expert may not "act as a mere conduit" for another expert's opinion.  *Ramirez v. Escajeda*, No. EP-17-CV-00193-DCG, 2021 WL 1131721, at *14 (W.D. Tex. Mar. 24, 2021).  The "[l]ack of [McDaniel's] originality is not dispositive," but "[t]he crucial issue is whether [he] independently evaluated or verified the opinions upon which he relies."  *United Servs. Auto. Ass'n v. Wells Fargo Bank, N.A.*, No. 2:18-CV-00366-JRG-RSP, 2019 WL 6896674, at *3 (E.D. Tex. Dec. 18, 2019) (quoting *Hunt*, 297 F.R.D. at 275).  An expert cannot parrot the opinions and conclusions of other experts whose testimony is not subject to cross-examination.  *Hunt*, 297 F.R.D. at 275.

Notably, McDaniel stated in his report and confirmed at his deposition that he was "not going to explore the cause of the incident at MMS in Beaumont, Texas." Instead, he indicated that he reviewed reports by others, including three other Plaintiffs' experts, and agreed with them about the cause of the incident:

> Q.   So going back to that statement we were talking about, "This report is not going to explore the cause of the incident at Marshall Middle School in Beaumont, T[exas]," which other expert reports address the cause of the incident at Marshall Middle School?
>
> A.   Rick Smith's, Paul Rosenfeld's, Rick Bost's.
>
> Q.   Okay. And so you are not addressing the cause of the incident because it's already being addressed by Mr. Smith, Mr. Bost, and Mr. Rosenfeld?
>
> A.   That is correct.

Specifically, he indicated that he reviewed the report of Plaintiffs' former boiler expert, Rick Smith ("Smith"), who passed away unexpectedly before he was deposed. During McDaniel's deposition, he stated the following:

> Q.   So with respect to Mr. Smith's prior report, my understanding, from what you told me . . . was that you were relying on Mr. Smith's report, but didn't have any specific opinion yourself as to what Mr. Smith testified about regarding the cause of the carbon monoxide incident. Is that not correct?
>
> A.   That is correct, but I do have an opinion that Mr. Smith was correct in his determination. So that wasn't perfectly clear, obviously.
>
> Q.   Well, what -- what kind of the analysis did you perform yourself to confirm Mr. Smith's conclusions?
>
> A.   I did no analysis, other than knowing Mr. Smith, knowing what we've gone through in the past, our conversations in the past, and that the determination he came with the facts that he put in his report made sense.

> Q.  Okay. So you're relying on the analysis that was done by Mr. Smith and haven't done any independent analysis yourself to confirm those, other than just agreeing with Mr. Smith's, based on your reading of it?
>
> A.  That's correct.

He further confirmed:

> Q.  [Y]ou haven't made an independent evaluation and come to an opinion about what caused this carbon monoxide release?
>
> A.  That's correct. I have not.

In other words, McDaniel admitted at his deposition that he did not undertake his own independent evaluation of the cause of the carbon monoxide release but merely agreed with other experts' reports. Because Smith is deceased, he will not be available for cross-examination as to his opinions on causation. Consequently, McDaniel cannot merely rely on "knowing Mr. Smith, knowing what [they have] gone through, [or their] conversations in the past" to support an expert opinion. Such a method falls far short of what is required under the Federal Rules of Evidence and *Daubert*. Thus, because McDaniel did not perform his own evaluation, his testimony is not reliable and he could not offer an opinion as to causation at trial. Moreover, in their summary judgment response, Plaintiffs do not provide other competent expert testimony on causation, including any testimony by the other experts whose reports McDaniel purportedly reviewed. Plaintiffs' burden is to produce sufficient evidence to create a fact issue. By relying almost solely on McDaniel's unreliable testimony, which would not be admissible at trial, Plaintiffs failed to meet this burden.

2.    McDaniel's Declaration

Further, McDaniel's subsequent declaration contradicts his report and deposition with respect to causation by stating generally that "Continental's inspection performed on November 5, 2015 was inadequate and the cause of this incident." This late-stage attempt to inject contradictory expert opinion testimony fails to create a fact issue as to causation. A declaration that contradicts the declarant's deposition testimony is not sufficient evidence to create a fact issue. *Free v. Wal-Mart La., LLC*, 815 F. App'x 765, 766 (5th Cir. 2020) (citing *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000)). Moreover, it is well settled that the Fifth Circuit "does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996); *accord Moffett v. Miss. Dep't of Mental Health*, 507 F. App'x 427, 434 (5th Cir. 2013); *Bouvier v. Northrup Grumman Ship Sys., Inc.*, 350 F. App'x 917, 920 (5th Cir. 2009); *McArdle v. Dell Prods., L.P.*, 293 F. App'x 331, 335 (5th Cir. 2008). "Conflicts between deposition testimony and subsequent affidavits or declarations are resolved in favor of the deposition testimony unless the conflict is explained." *Colindres v. Quietflex Mfg.*, 427 F. Supp. 2d 737, 746 (S.D. Tex. 2006) (citing *Valleza v. City of Laredo*, 331 F. Supp. 2d 579, 582-83 (S.D. Tex. 2004)). Thus, "under the 'sham affidavit' doctrine, a 'nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, [his] previous testimony.'" *Powell v. Dall. Morning News L.P.*, 776 F. Supp. 2d 240, 247 (N.D. Tex. 2001) (quoting *Albertson v. T.J. Stevenson & Co., Inc.*, 749 F.2d 223, 228 (5th Cir. 1984)); *see Scott v. Harris*, 550 U.S. 372, 380 (2007).

32

The sham affidavit doctrine, however, "is applied sparingly and may be invoked only where there is some inherent inconsistency between an affidavit and a deposition." *Eure v. Sage Corp.*, 61 F. Supp. 3d 651, 658 (W.D. Tex. 2014); *see Axxiom Mfg., Inc. v. McCoy Invs., Inc.*, 846 F. Supp. 2d 732, 750 (S.D. Tex. 2012). When a subsequent affidavit "merely supplements rather than contradicts prior deposition testimony, the court may consider the affidavit when evaluating genuine issues in a motion for summary judgment." *Durant v. Brooks*, 826 F. App'x 331, 336 (5th Cir. 2020) (citing *S.W.S. Erectors, Inc.*, 72 F.3d at 496). An affidavit is supplementary if it clarifies or provides additional facts not given in the prior deposition and when the prior deposition "only glanced upon the disputed issue." *Sabre Indus. Inc. v. Module X Solutions, L.L.C.*, 845 F. App'x 293, 298 (5th Cir. 2021).

"The inquiry, as a whole, is aimed at gleaning whether the later affidavit is 'so markedly inconsistent with the affiant's prior deposition as to constitute an obvious sham.'" *Id.*; *Winzer v. Kaufman County*, 916 F.3d 464, 472 (5th Cir. 2019). If the court finds that an affidavit or sworn statement contradicts prior deposition testimony, it is properly excluded from consideration in connection with a motion for summary judgment. *Free v. Wal-Mart La., L.L.C.*, 815 F. App'x 765, 767 (5th Cir. 2020) (affirming district court's exclusion of plaintiff's affidavit where she provided no explanation for its contradictory statements); *Bouvier*, 350 F. App'x at 920 (affirming district court's exclusion of plaintiff's sworn statement, which was inconsistent with her prior deposition testimony); *Pazarin v. Armes*, 512 F. Supp. 2d 861, 870 (W.D. Tex. 2007) (striking plaintiff's affidavit where she provided no explanation for its contradictory statements). "[C]ourts typically require some explanation for an inconsistency between a deposition and affidavit." *Free*,

33

815 F. App'x at 767. Thus, "[a] court may . . . strike an affidavit that, without explanation, conflicts with prior deposition testimony." *Id.*

"Although the court must resolve all factual inferences in favor of the nonmovant, the nonmovant cannot manufacture a disputed material fact where none exists." *Blank v. United States*, No. 4:20-CV-096-A, 2021 WL 4037500, at *2 (N.D. Tex. Sept. 2021) (citing *Albertson v. T.J. Stevenson & Co., Inc*, 749 F.2d 223, 228 (5th Cir. 1984)). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Doe*, 220 F.3d at 386; *see Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (recognizing that lower courts "have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity").

Furthermore, "a summary assertion made in an affidavit is simply not enough proof to raise a genuine issue of material fact." *Shastry v. U.S. Bank Nat'l Ass'n*, No. 3:16-cv-3335-G-BN, 2021 WL 849015, at *5 (N.D. Tex. Feb. 11, 2021), adopted by 2021 WL 842132 (N.D. Tex. 2021) (citing *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009)); *accord Galindo*, 754 F.2d at 1216; *see Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991) ("What is needed in an affidavit of this sort are facts, reasons, observations, and explanations—in a word, *evidence*—not sweeping conclusions.") (emphasis in original).

34

In this situation, Plaintiffs cannot raise a genuine issue of material fact based on McDaniel's inconsistent statements. Notably, McDaniel's declaration was signed on July 12, 2021, *after* Continental filed its Motion for Summary Judgment. In fact, in his declaration, McDaniel specifically notes Continental's summary judgment argument that he did not adequately address causation. McDaniel's deposition, as well as his report, contradict his declaration with respect to his opinion regarding causation. In his deposition, McDaniel stated:

> Q.    As you sit here today, can you tell us what would have happened if Mr. Nester had gone through those steps and turned off the power to the fan, whether the boiler would have turned off or not?
>
> A.    Well, if the boiler didn't turn off and the fan was turned off, the next step is to red-tag the boiler, from his standpoint, until he had somebody tell him why.
>
> Q.    Yeah. My -- I'm going one step back from that. So do you know what would have happened if he had switched the switch off, if he turned the --
>
> A.    No, I do not.
>
> Q.    Okay. So it's entirely possible that Mr. Nester would have walked into that room, gone through those steps, cut off the power to the fan, and the boiler would have turned off as well, right?
>
> A.    If everything worked, yes. But again, unless he did that, you don't know – he doesn't know.

The only information McDaniel provides in the declaration to support his contention that the boiler inspection was the cause of the incident, however, is the following:

> It is a fact that on January 28, 2016 the boiler was operating in the absence of proper air flow from the ventilation fans. This event would not have occurred otherwise. This fact confirms that had Nester put the boiler in operation and stopped the fans, during his November 5, 2015 [sic], the boiler would not have stopped, just as it did not stop on January 28, 2016 when the combustion fan seized up.

35

At deposition, McDaniel explicitly stated that he did not know what would have happened if Nester had taken these actions and that it was possible the boiler would have turned off. In contrast, in his declaration, he stated that the boiler would not have turned off if Nester had completed these steps. This assertion, therefore, directly contradicts McDaniel's deposition testimony. Moreover, McDaniel stated both in his expert report and at deposition that he would not address causation yet he then proceeded to do so in the declaration filed well after the deposition and only after Continental's motion for summary judgment had been submitted. McDaniel's declaration is not only contradictory, but it is also conclusory and conjectural, lacking any underlying independent analysis or factual support for his newly-rendered opinion regarding causation. Consequently, McDaniel's declaration cannot serve to create a genuine issue of fact as to causation.

### 3.    McDaniel's Errata Sheets

With regard to McDaniel's testimony on causation, Plaintiffs contend that McDaniel "clarified" his deposition testimony and provided his own opinion on causation via changes he made on his errata sheet. Continental counters that a second errata sheet, which contains these changes, is inadmissible evidence that should not be considered as part of the record because it does not comply with Federal Rule of Civil Procedure 30(e). Continental further asserts that even if the second errata sheet is admissible, it "does not negate any of the grounds for his exclusion because it does not show that he is qualified to testify about the standard of care applicable to a Texas boiler inspector and does not overcome the reliability problems that were evident in his report and deposition." According to Continental, the "shifting and contradictory" changes made to McDaniel's deposition testimony in the second errata highlight the unreliability of his opinions.

36

It is well established that a deponent may make changes to his or her deposition testimony.

Federal Rule of Civil Procedure 30(e) provides that:

> On request by the deponent or a party before the deposition is completed, the deponent shall have 30 days after being notified by the court reporter that the transcript . . . is available in which to review the transcript . . . and, if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

FED. R. CIV. P. 30(e); *see Reed v. Hernandez*, 114 F. App'x 609, 611 (5th Cir. 2004). Many courts in the Fifth Circuit have held that deponents may make substantive, contradictory changes to their deposition testimony. *See, e.g., Hernandez v. Rush Enters., Inc.*, 336 F.R.D. 534, 536 (E.D. Tex. 2020); *accord Broussard v. Bd. of Supervisors of La. State Univ.*, No. 19-00527-BAJ-RLB, 2021 WL 3032666, at *5 (M.D. La. July 19, 2021); *Crawford v. Mare Mortg., LLC*, No. 4:05-CV-186-LR, 2006 WL 1892072, at *1 (S.D. Miss. July 10, 2006). Additionally, "[f]ederal courts have typically been more forgiving of changes made to deposition testimony that come before summary judgment motions have been filed." *Raytheon Co. v. Indigo Sys., Corp.*, No. 4:07-cv-109, 2009 WL 424773, at *2 (E.D. Tex. Feb. 18, 2009). Rule 30(e), however, "does not provide any exceptions to its requirements." *Reed*, 114 F. App'x at 611 (holding that untimely substantive and contradictory changes to deposition testimony were not admissible because they did not comply with Rule 30(e)). "[P]arties making substantive changes to their deposition testimony must provide a sufficient explanation for the changes." *Riley v. Ford Motor Co.*, No. 2:09-CV-148-KS-MTP, 2011 WL 3157204, at *4 (S.D. Miss. July 26, 2011). "One-word, conclusory explanations are not sufficient." *Id.*; *see Crawford*, 2006 WL 1892072, at *1 (holding that where changes to the deposition testimony substantially altered or contradicted earlier testimony, "one-word explanations . . . are insufficient to amount to 'reasons' within the meaning

of Rule 30(e), as changing a 'yes' response to a 'no' requires more rationale than the word 'correction'"). Should a deponent seek to change his testimony without sufficient explanation, the court is not required to allow the amendment.

McDaniel was deposed on May 6, 2021. Continental asserts that on June 1, 2021, the court reporter emailed Continental regarding McDaniel's errata sheet. Specifically, the email contained three attached documents: (1) a cover letter from the court reporter dated June 1, 2021, (2) a declaration dated May 23, 2021, electronically signed by McDaniel, in which he swore that the deposition testimony was true and correct, except for the changes listed on the errata sheet, and (3) the errata sheet, which was also dated May 23, 2021, and electronically signed by McDaniel. The signed errata sheet contained six changes correcting short words or phrases in the deposition transcript. Continental also contends that on June 7, 2021, the court reporter sent a second email, containing an identical subject line, the same June 1, 2021, cover letter, and the original errata sheet, but also attaching a second errata sheet to the end of the original errata sheet. The second errata sheet was unsigned, undated, and was in a different format and font than the first errata sheet. Further, it contained six additional substantive changes to McDaniel's testimony. Continental filed the instant motion several weeks later, on June 29, 2021. To explain the discrepancies between the two errata sheets, Plaintiffs contend that McDaniel submitted the original changes to the court reporting website on May 23, 2021. Then, according to Plaintiffs, sometime between June 1 and June 7, 2021, McDaniel attempted to make additional changes to his deposition testimony but was unable to access the electronic errata link. He then allegedly contacted the court reporter, who informed him that the errata link is accessible only once, and,

38

because the 30-day deadline to make changes had not passed, sent him a form to make the additional changes.

In his second errata sheet, which is neither dated nor signed, McDaniel made numerous substantive changes to his deposition testimony and included contradictory responses to questions posed. McDaniel, however, provided only a vague, two-word explanation for each of the six changes he made in the second errata sheet—"for clarification." Continental contends that "[t]he unsigned second errata appears to have been an attempt to mitigate McDaniel's concessions in his deposition by offering 'clarifications' that contradict his report and sworn testimony." Indeed, McDaniel's changes do not directly answer the questions asked of him and add information that appears out of place. For example, McDaniel was asked the following question: "So it's entirely possible that Mr. Nester would have walking into that room, gone through those steps, cut off the power to the fan, and the boiler would have turned off as well, right?" In response, McDaniel originally testified that if Nester had fired the boiler and then turned off the fans, as he believes Nester should have done to test the interlock, the boiler could have turned off, indicating the interlock was operating properly. He then "clarified" this testimony in the second errata sheet, stating: "[Nester] did not complete a proper inspection. If he did a proper inspection[,] the incident would not have happened." McDaniel also stated in the second errata sheet that if Nester had "tested the [interlock] switch with a proper inspection, he would have found a probable cause of the CO release,"—yet, he testified in his deposition that he did not know whether there was an interlock at all. Moreover, as discussed in the court's order regarding the scope of McDaniel's testimony, McDaniel is not qualified to opine as to what "a proper inspection" of a boiler in Texas encompasses.

39

While such changes in substance may be permissible under certain circumstances, the second errata sheet does not satisfy the requirements of Rule 30(e). Importantly, McDaniel did not sign the second errata sheet within the required 30-day period. Although Plaintiffs provided a notarized and signed copy of the second errata sheet on November 15, 2021, as part of the supplemental briefing addressing Continental's Motion for Summary Judgment, this is not sufficient to cure the deficiency and satisfy the requirements of Rule 30(e). Further, Plaintiffs' and McDaniel's stated explanation for the changes in the second errata sheet is that they are "for clarification." This two-word reason is conclusory and insufficient to explain the far-reaching and contradictory, substantive changes McDaniel made to his deposition testimony. In any event, Plaintiffs never cited to the second errata sheet in their summary judgment response. Indeed, Plaintiffs admitted that they were not relying on the second errata sheet to defeat summary judgment. Therefore, the court finds that the second errata sheet is inadmissible because it does not comply with Rule 30(e) and declines to consider it as part of the record.

### 4. Interlock

McDaniel faults Nester for not identifying several alleged issues with the boiler but admits that most of these issues would not have caused the carbon monoxide release. Indeed, in their summary judgment response, Plaintiffs focus the crux of their argument on the fan interlock. McDaniel asserts that Nester should have asked for the boiler to "be fired" and then disabled the air flow to the fans to ensure the interlock was operating properly.

McDaniel concedes, however, that he does not know what would have happened had Nester taken these steps and also admits that, even if Nester had activated the boiler and disabled the fans, the boiler could have turned off, indicating the interlock was operating properly.

McDaniel further admits that it is appropriate for an inspector to rely on the boiler attendant's confirmation of the interlock's presence.  Additionally, McDaniel testified that he did not know if Boiler 840 had an interlock, and, if it did, what type it was, whether it worked, how it was electrically wired, or whether it was required to be connected to the exhaust fan pursuant to the Texas Boiler Law and Rules.  Moreover, while the Texas Boiler Rules require that a boiler be inspected while in operation, if possible, and that the boiler and fans have an interlock, the Rules do not explicitly state that an inspector must ensure that the interlock is operating properly by testing the interlock while firing the boiler.  Notably, the TDLR issued a public statement that section 65.603, which contains the interlock requirement, "should not be interpreted as inspection checklist items" and is the responsibility of the boiler owner and operator.  *See* 40 Tex. Reg. 3125 (2015).  Further, McDaniel conceded that individual inspectors have discretion in determining whether to perform an internal or external inspection and that the Chief Boiler Inspector is the ultimate authority on what is required for a boiler inspection.  Indeed, contrary to McDaniel's testimony, Troutt testified that an inspector is not required to fire a boiler during an external inspection.

McDaniel also asserts that Nester should have noticed evidence of flame impingement, or flame rollout, on the boilers.  In his deposition, however, McDaniel stated that he would not opine that flame impingement was a cause of the carbon monoxide emission, or even that it was a contributing factor.  Instead, he stated that he would only opine that it "could have been" a contributing factor.  Plaintiffs also point to deposition testimony of Continental's formerly retained expert, John Puskar ("Puskar"), in which he discussed issues he observed with Boiler 840

41

post-incident.  Puskar, however, similarly testified that he could not opine on whether flame rollout caused the carbon monoxide emission:

> Q.     Do you know, as you sit here today, whether that flame rollout caused the carbon monoxide release on January 28, 2016?
>
> A.     I do not.

Notably, in reference to flame impingement, Plaintiffs contend that "[t]he exact source of the carbon monoxide production really isn't relevant" anyway.  Instead, they assert that the relevant issue is why the interlock did not shut down the boiler on the day of the incident:

> [R]egardless of the reason for the carbon monoxide production, had there been a properly functioning combustion safety interlock between the ventilation fans and the boiler, the carbon monoxide produced by the unsafe boiler would not have been allowed to accumulate in the boiler room so as to be distributed throughout the school.

> Importantly, however, Troutt's testimony indicates that the interlock *was* working properly

on the day of the incident, but that the switch was merely moved to the off position:

> Q.     And when you observed 840 boiler at Marshall Middle School in January of 201[6] was the interlock working properly?
>
> A.     When the light switch was turned on, yes.
>
> Q.     And your point about the light switch is?
>
> A.     So the light -- if the light switch is turned on, the fan is running.  If the light switch is turned off, the fan is not running. The power for the boiler was switched over -- was taken over to -- or the trip for the interlock of the boiler was taken to the fan – or to the light switch instead of the fan.

Plaintiffs admit as much: "Troutt found the interlock only worked properly with the wall switch in the 'on' position when he inspected the boiler on the day of the event.  Importantly, a properly functioning interlock should not be defeated by the flick of a switch (or else it's not a true

interlock)." McDaniel, however, confirmed that this particular wall switch configuration is typical for interlocks for boilers installed in the late 1980s, the time period during which Boiler 840 was installed. Thus, the wall switch could have been flipped from "on" to "off" on the day of the incident, which deactivated the interlock device temporarily, rather than the entire interlock operating improperly. In any event, Plaintiffs have not definitively identified through admissible expert testimony any problem that existed on the day of the inspection that later caused the carbon monoxide emission. Plaintiffs must show more than just a mere possibility that Nester's acts or omissions caused or created a condition that made the carbon monoxide event possible. *See Mason v. Amed-Health, Inc.,* 582 S.W.3d 733, 789-90 (Tex. App.—Houston [1st Dist.] 2019, pet. filed) (citing *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc.*, 143 S.W.3d at 798-99).

### 5.    Wall Switch Configuration

Plaintiffs criticize Boiler 840's interlock wall switch configuration, but admitted that the interlock device worked properly on the day of the carbon monoxide emission when the switch was moved to the "on" position. To establish proximate cause, Plaintiffs must show that Nester had a duty of care regarding the switch and that it was foreseeable to Nester that someone would turn the switch off, causing the interlock to stop working properly. While the wall switch configuration arguably could be viewed as a design flaw in the interlock system, it was commonly used at the time the boiler was installed, according to all the expert testimony in the record. Plaintiffs cannot establish that it was the duty of the jurisdictional inspector to redesign the boiler interlock system or to remove a boiler with such a configuration from service. Notably, Plaintiffs admit that many boilers presently in use in Texas utilize the same wall switch design—boilers that presumably pass jurisdictional inspections regardless of their interlock configuration. Indeed, the

43

Texas Boiler Law and Rules require an interlock but do not specify the exact design of the interlock device. Plaintiffs have not offered any evidence that boiler inspectors have a duty to confirm that boilers have a particular type of interlock design or to render inoperative boilers with certain types of interlock device configurations. Thus, Plaintiffs have not shown that Nester's duty of care as an inspector entailed examining the interlock switch or that he had the duty to take Boiler 840 out of operation based on the wall switch design.

Further, although it is not clear from the record whether the plastic bag found in the fan affected the interlock's operation on the day of the emission, Plaintiffs have not shown—nor attempted to show—that Nester could have foreseen that a foreign object would get caught in the fan 84 days after his inspection. Moreover, according to evidence in the record, the MMS boilers automatically turned on when the outside temperature reached 45 or 50 degrees Fahrenheit. After Nester's inspection, the temperature in Beaumont fell within that range on 20 school days. In fact, Plaintiffs concede that the boilers operated properly after Nester's inspection and before the carbon monoxide release. Indeed, even McDaniel admitted that Boiler 840 operated without incident *after* Nester's inspection. Hence, Plaintiffs have failed to show that it was foreseeable that Nester's inspection would cause the carbon monoxide emission that occurred 84 days later. Therefore, in the absence of admissible expert testimony on this topic, Plaintiffs cannot show that Nester's inspection proximately caused the carbon monoxide emission at MMS.

E.    Gross Negligence

It is well established that a party cannot succeed on a gross negligence claim in the absence of a viable negligence claim. *City of Dallas v. Patrick*, 347 S.W.3d 452, 458 (Tex. App.—Dallas 2011, no pet.); *Sonic Sys. Int'l, Inc. v. Croix*, 278 S.W.3d 377, 394-95 (Tex. App.—Houston

[14th Dist.] 2008, no pet.); *Hall v. Stephenson*, 919 S.W.2d 454, 467-68 (Tex. App.—Fort Worth 1996, writ denied) (citing *Shell Oil Co. v. Humphrey*, 880 S.W.2d 170, 174 (Tex. App.—Houston [14th Dist.] 1994, writ denied); *Trevino v. Lightning Laydown, Inc.*, 782 S.W.2d 946, 949 (Tex. App.—Austin 1990, writ denied) ("Although . . . gross negligence refers to a different character of conduct, one's conduct cannot be grossly negligent without being negligent."). Thus, because Plaintiffs do not have a viable negligence claim, they cannot succeed on their claim of gross negligence or willful and wanton conduct.

III.    Conclusion

In sum, Plaintiffs have not produced any evidence—let alone, sufficient evidence—to show that Continental's conduct caused the carbon monoxide release. While Plaintiffs claim that Nester's inspection was negligent, Plaintiffs cannot show that the interlock would have failed had Nester activated the boiler during his inspection. Importantly, "cause in fact is not established where the defendant's negligence does no more than furnish a condition which makes the injuries possible." *Mason*, 582 S.W.3d at 789-90. Plaintiffs assert that Nester failed to activate the boiler and test the interlock during his inspection on November 5, 2015, but they do not offer a modicum of evidence as to how this conduct caused the release of carbon monoxide 84 days later, on January 28, 2016, or that such a release was foreseeable at the time of the inspection. In their response, Plaintiffs rely entirely on McDaniel's unreliable and inconsistent testimony to show that Nester's inspection of the boiler was deficient without proffering any competent evidence regarding the proximate cause of the carbon monoxide incident. Indeed, the court has excluded McDaniel as a witness about the causation of the carbon monoxide discharge, including his

opinion regarding how any acts or omissions of Nester during his inspection of Boiler 840 caused the carbon monoxide emission at MMS.

Finally, Plaintiffs suggest that McDaniel will supplement his report to offer new opinions about causation because the evidentiary record was incomplete at the time Continental filed its Motion for Summary Judgment.  McDaniel, however, is not qualified to render an expert opinion regarding the duty of care of boiler inspectors in Texas or the cause of the carbon monoxide emission, and, therefore, he has been excluded as an expert on those issues, rendering supplementation of his report unavailing.  Moreover, as Continental correctly points out, "[i]f the evidence upon which Plaintiffs rely to avoid summary judgment is incomplete, then summary judgment should be granted—Plaintiffs have failed to carry their burden to timely point to evidence in the record to establish material facts in dispute."  In fact, discovery was completed on June 15, 2021, and Continental's Motion for Summary Judgment complied with the court's scheduling order.  Plaintiffs made no effort to extend the deadlines regarding the Motion for Summary Judgment.  The time for supplementation has long passed.

Consequently, Plaintiffs have failed to meet their burden as nonmovants to adduce sufficient evidence to demonstrate a genuine issue of material fact.  *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013).  Thus, the court concludes that the summary judgment evidence submitted fails to create a cognizable fact issue as to whether Nester's acts or omissions were the proximate cause of the carbon monoxide release at MMS.  Hence, Plaintiffs cannot establish the existence of an element essential to their case, namely, causation, on which they bear the burden of proof at trial, rendering summary judgment appropriate.

46

In accordance with the foregoing analysis, Continental's Motion for Summary Judgment (#143) is GRANTED.  Plaintiffs fail to present a claim that warrants relief.  There remain no material facts in dispute, and Continental is entitled to judgment as a matter of law.

SIGNED at Beaumont, Texas, this 6th day of January, 2022.

MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE